## ISTITUTO BANCARIO ITALIANO SpA, Plaintiff Below, Appellant,

v.

## HUNTER ENGINEERING COMPANY, INC., Efday B.V., Hans Niederer, Tools Machine-Engereedschappenhandel B.V., Piero Bugnone, and Aldo Bugnone, Defendants Below, Appellees.

### No. 93, 1981.

Supreme Court of Delaware.

Submitted Sept. 18, 1981.

Decided July 20, 1982.

---

Lewis S. Black, Jr. and Richard D. Allen of Morris, Nichols, Arsht & Tunnell, Wilmington, and Martin E. Lowy (argued) and John M. Townsend of Hughes, Hubbard & Reed, New York City, for appellant.

Charles S. Crompton, Jr. (argued) and Donald J. Wolfe, Jr. of Potter, Anderson & Corroon, Wilmington, and John W. Castles

3d and Laurie E. Foster of Lord, Day & Lord, New York City, for appellees Hans Niederer and Tools Machine-En-Gereedschappenhandel B.V.

Charles F. Richards, Jr. (argued) and William J. Wade of Richards, Layton & Finger, Wilmington, for appellee Hunter Engineering Co., Inc.

Eduard F. vonWettberg, III of Morris, James, Hitchens & Williams, Wilmington, for appellee Efday, B.V.

Before McNEILLY, QUILLEN and HORSEY, JJ.

QUILLEN, Justice:

This action was filed by Istituto Bancario Italiano SpA (IBI) in the Court of Chancery seeking to have cancelled 190,000 shares of the 200,000 shares of Hunter Engineering Company, Inc. (Hunter), which had been issued to Hunter's parent, Efday B.V. (Efday), as a stock dividend, and then sold to Tools Machine-En-Gereedschappenhandel B.V. (Tools), the present owner of the shares. IBI, the pledgee from Efday of the original 10,000 shares of Hunter common stock, charged that the 190,000 shares were fraudulently issued as part of a conspiracy to dilute IBI's control of Hunter. IBI is an Italian banking corporation. Hunter is a Delaware corporation with principal offices in California. Efday and Tools are Dutch corporations with principal offices in Amsterdam.

Without reaching the merits, the Chancellor granted defendants' motion to dismiss under Court of Chancery Rule 12(b)(2) [1] on the grounds that the Court of Chancery lacked jurisdiction over nonresident defendants Tools and Dr. Hans Niederer. *Istituto Bancario Italiano SpA v. Hunter Engineering Co., Inc.*, Del.Ch., 428 A.2d 19 (1981). IBI docketed this appeal. Because we find that, on the stipulated facts, the Court of Chancery does have jurisdiction to adjudicate the merits, we reverse in part.

I

The facts for present purposes are presented by way of stipulation of the parties which enables the Court to exercise its judgment on certain legal questions without, at this stage, adjudicating facts which may be in dispute.

The complaint alleged that the several defendants conspired to defraud the plaintiff by diluting its stockholding in Hunter, the Delaware corporation. Pursuant to agreement: Hunter's certificate of incorporation was amended, increasing the authorized number of shares of common stock from 25,000 (10,000 of these shares had been previously issued) to 200,000; a stock dividend was declared in a 19:1 ratio in favor of the parent Efday; and 190,000 newly issued shares of common stock were sold by Efday to Tools. Plaintiff seeks cancellation of the 190,000 shares. In addition to Tools, Hunter and Efday, the other members of the alleged conspiracy are: Piero and Aldo Bugnone,[2] the heads of the Bugnone Group

1. Court of Chancery Rule 12(b) provides:

   "(b) How Presented. Every defense, in law or fact, to a claim for relief in any pleading, whether a claim, counter-claim, cross-claim or third-party claim, shall be asserted in the responsive pleading thereto if one is required, except that the following defenses may at the option of the pleader be made by motion: (1) Lack of jurisdiction over the subject matter, (2) lack of jurisdiction over the person, (3) improper venue, (4) insufficiency of process, (5) insufficiency of service of process, (6) failure to state a claim upon which relief can be granted, (7) failure to join a party under Rule 19. A motion making any of these defenses shall be made before pleading if a further pleading is permitted. No defense or objection is waived by being joined with 1 or more other defenses

   or objections in a responsive pleading or motion. If a pleading sets forth a claim for relief to which the adverse party is not required to serve a responsive pleading, he may assert at the trial any defense in law or fact to that claim for relief. If, on a motion asserting the defense numbered (6) to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the Court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56."

2. After the bankruptcy of their corporate empire, the Bugnone brothers vanished and are

consisting of a number of corporate enterprises, which include Hunter and Efday; and Dr. Hans Niederer, a lawyer and banker residing in Switzerland, who devised the plan, and who has since been named Chairman of the Board of Hunter; and Tools, which is a Dutch corporation owned by Dr. Niederer's relatives.

Suit was filed in the Court of Chancery. Defendant Hunter was served in Delaware through its registered agent, while Niederer, a current director of Hunter, and Piero and Aldo Bugnone, former directors, were served pursuant to the Nonresident Director Consent statute, 10 *Del.C.* § 3114(a).[3] Tools, the registered owner of the 190,000 stock dividend shares, and Efday, the registered owner of the 10,000 shares pledged to plaintiff IBI, were served by order of the Court of Chancery pursuant to 10 *Del.C.* § 365 on the basis of the statutory presence of the stock in Delaware under 8 *Del.C.* § 169.[4] In addition, both Niederer and Tools were served pursuant to the Delaware long arm statute, 10 *Del.C.* § 3104.[5]

now fugitives at large and their whereabouts are currently unknown.

3. "(a) Every nonresident of this State who after September 1, 1977, accepts election or appointment as a director, trustee or member of the governing body of a corporation organized under the laws of this State or who after June 30, 1978, serves in such capacity and every resident of this State who so accepts election or appointment or serves in such capacity and thereafter removes his residence from this State shall, by such acceptance or by such service, be deemed thereby to have consented to the appointment of the registered agent of such corporation (or, if there is none, the Secretary of State) as his agent upon whom service of process may be made in all civil actions or proceedings brought in this State, by or on behalf of, or against such corporation, in which such director, trustee or member is a necessary or proper party, or in any action or proceeding against such director, trustee or member for violation of his duty in such capacity, whether or not he continues to serve as such director, trustee or member, at the time suit is commenced. Such acceptance or service as such director, trustee or member shall be a signification of the consent of such director, trustee or member that any process when so served shall be of the same legal force and validity as if served upon such director, trustee or member within this State and such appointment of the registered agent (or, if there is none, the Secretary of State) shall be irrevocable."

4. 10 *Del.C.* § 365 provides:
"If, after summons or other process issued out of the Court of Chancery, any defendant therein named does not appear in obedience to the process and according to the rules of such Court, the Court may, on affidavit that such defendant is out of the State, or cannot be found to be served with process and that there is just ground to believe that he intentionally avoids such service, make an order for his appearance on a certain day and publish such order as the Court directs not less than once a week for 3 consecutive weeks. If the defend-

ant does not appear, after such publication, according to the order, the Court may enter judgment by default against the nonappearing defendant, and may thereupon issue process to compel the performance either by seizure of the real and personal property of such defendant or part thereof, sufficient to satisfy the plaintiff's demand, or by causing possession of the estate, or effects, demanded by the complaint, to be delivered to the plaintiff, or otherwise, as the case requires. The Court may also order the plaintiff to be paid his demand out of any property so seized, upon his giving approved security, in a sufficient sum, to abide any order of the Court for the restitution thereof upon the defendant's appearing to defend the action, and paying such costs as the Court shall order. If such security is not given, the property seized, or whereof possession is ordered to be delivered, shall remain under the direction of the Court in the hands of a receiver or otherwise, until the defendant's appearance, or until such order is made therein as the Court deems is just."
8 *Del.C.* § 169 provides:
"For all purposes of title, action, attachment, garnishment and jurisdiction of all courts held in this State, but not for the purpose of taxation, the situs of the ownership of the capital stock of all corporations existing under the laws of this State, whether organized under this chapter or otherwise, shall be regarded as in this State."
For a discussion of constructive service under § 365, see Folk, *The Delaware General Corporation Law*, Appendix I, 601–03 (1972). See also *Winitz v. Kline*, Del.Ch., 288 A.2d 456, 461–62 (1971).

5. 10 *Del.C.* § 3104 provides in pertinent part:
"(a) The term 'person' in this section includes any natural person, association, partnership or corporation.
(b) The following acts constitute legal presence within the state. Any person who commits any of the acts hereinafter enumerated thereby submits himself to the jurisdiction of the Delaware courts and is deemed thereby to

Niederer and Tools moved to dismiss this action pursuant to Rule 12(b)(2) for lack of jurisdiction over their individual and corporate persons. Hunter, in a related motion, moved to dismiss pursuant to Rule 12(b)(7), arguing that Tools was an indispensable party and must be joined for the action to proceed. Efday answered the complaint, not objecting to jurisdiction. Piero and Aldo Bugnone are in default.

IBI moved for a preliminary injunction to preserve the status quo pending resolution of the dispute before the Delaware courts. An order was entered on stipulation effectively preserving plaintiff's rights pending resolution of this case.

Since 1971, plaintiff IBI has acted as banker for Imeco, a large Italian holding company forming the Bugnone Group. The obligations of the Bugnone Group to IBI exceeded $52 million by 1978. At that time, Imeco informed IBI that it would be unable to meet its obligations as they matured, and induced IBI to agree to a restructuring of Imeco's debts. IBI agreed to the restructuring on the condition that Imeco grant to IBI security interests in the stock of a number of its subsidiaries, including Hunter.

Efday, the record owner of all of Hunter's outstanding shares before the charter amendment and sale to Tools, deposited the shares in Finter Bank, a Swiss bank, and pledged them to IBI, creating a security interest in favor of IBI in Hunter of 100% of Hunter's 10,000 outstanding shares.[6] IBI did not register its security interest on the books of Hunter, nor place a legend on the stock certificate representing the 10,000 shares.

By the beginning of 1980, the Bugnone Group was in financial straits and soon fell into bankruptcy. In January 1980, Piero Bugnone and Dr. Hans Niederer realized the plight of Imeco and that if Imeco were declared bankrupt, IBI would assert its right to the 10,000 shares of Hunter pledged to it. To prevent this, Piero Bugnone and Dr. Niederer devised the following plan, in which Efday, Hunter and Tools agreed to participate:

(1) Hunter would amend its certificate of incorporation to increase the number of shares of common stock authorized from 25,000 to 200,000;

(2) Hunter would issue the 190,000 new shares to Efday in the form of a stock dividend;

have appointed and constituted the Secretary of State of this State his agent for the acceptance of legal process in any civil action against such nonresident person arising from the following enumerated acts. The acceptance shall be an acknowledgement of the agreement of such nonresident that any process when so served shall have the same legal force and validity as if served upon such nonresident personally within the State, and that such appointment of the Secretary of State shall be irrevocable and binding upon his personal representative.

(c) As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any nonresident, or his personal representative, who in person or through an agent:

(1) Transacts any business or performs any character of work or service in the State;

(2) Contracts to supply services or things in this State;

(3) Causes tortious injury in the State by an act or omission in this State;

(4) Causes tortious injury in the State or outside of the State by an act or omission outside the State if he regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from services, or things used or consumed in the State;

(5) Has an interest in, uses or possesses real property in the State; or

(6) Contracts to insure or act as surety for, or on, any person, property, risk, contract, obligation or agreement located, executed or to be performed within the State at the time the contract is made, unless the parties otherwise provide in writing."

6. The actual letter evidencing the security interest reads: "We had previously caused 10,000 shares representing the *whole capital stock* of [Hunter] to be deposited with Finter Bank, and . . . we intended irrevocably to give a security interest in such shares in favor of I.B.I. . . . ." (emphasis added). And the stipulation states that "IBI relied on Efday's representation and believed that 100% of the stock of Hunter, and thus the full value of Hunter itself, was pledged to it as security for Imeco's debts."

(3) The 190,000 shares would then be transferred to Tools, thereby giving Tools 95% of Hunter.

On January 24, 1980, pursuant to the plan, the Board of Directors of Hunter consisting of Piero and Aldo Bugnone and Paul Hoboy, President of Hunter, met by telephone and adopted the following resolutions:

(i) authorizing Hunter's certificate of incorporation to be amended to increase the number of Hunter's authorized shares from 25,000 to 200,000;

(ii) directing that the amendment be submitted to the sole shareholder, Efday, for approval; and

(iii) directing that the officers of the corporation, upon receipt of the shareholder's consent, execute and file with the Secretary of State of Delaware an amendment to Hunter's certificate of incorporation.[7]

Pursuant to the resolutions adopted by the Hunter board on January 24, 1980, Piero Bugnone executed a Unanimous Consent of Sole Shareholder on behalf of Efday approving the planned amendment to Hunter's certificate of incorporation. Hoboy, on January 25, 1980, executed the certificate of amendment and caused it to be filed with the Secretary of State of Delaware on January 30, 1980. The stock dividend issued. See 8 *Del.C.* § 173.

On February 11, 1980, Tools and Efday executed an agreement by the terms of which Tools agreed to purchase the 190,000 shares for $7,800,000. That agreement was to be governed by Dutch law "except to the extent that the laws of the State of Delaware apply to the transactions contemplated hereunder by [Hunter]." Efday endorsed the certificate representing 190,000 shares to Tools. Also on February 11, Efday forgave a $1.65 million debt allegedly owed to it by Hunter.

Tools and Efday entered into a supplemental agreement concerning the sale of the 190,000 shares. That agreement contained, among other things:

(i) A representation that Hunter was incorporated in Delaware and in good standing in Delaware;

(ii) A representation that all documents "required by the relevant authorities within whose jurisdiction [Hunter] operates [i.e., Delaware and California] have been duly filed; and

(iii) An option granted by Efday to Tools to acquire "the remaining 10,000 shares" of Hunter stock.

On March 17, 1980, Tools executed a written consent as a stockholder to elect Niederer a director of Hunter.[8] Niederer signed that consent on behalf of Tools, and Piero Bugnone signed for Efday. On the same day, Niederer was elected Chairman of Hunter's Board of Directors. Currently, Niederer holds Tool's proxy to vote its 190,000 shares of Hunter stock.

Tools surrendered the certificate it had received from Efday for the 190,000 shares of Hunter common with Hunter issuing a new certificate to Tools, on the authority and with the approval of Niederer (Chairman of Hunter), G. H. Kaars Sijpesteijn (Chairman of Tools), Paul Hoboy (President of Hunter), and Marion Marshall (Corporate Secretary of Hunter). The certificate was signed by Hoboy and Marshall and issued on behalf of Hunter in California. The share certificate issued to Tools is now in

---

7. The stipulation states that the plan commenced with an offer by Tools to buy 190,000 shares, all but 15,000 shares of which, at the time of that offer, had not been authorized or issued. The Unanimous Consent of the Sole Shareholder (Efday) reads "an offer having been received from Tools Machine-en-Gereedschappenhandel B.V. to purchase 190,000 shares of Common Stock of Hunter Engineering Co., Inc., with a par value of $.01 per share, for an aggregate consideration of $3,500,000 * * *." It should also be noted that plaintiff contends the form of the plan circumvented 8 *Del.C.* § 153 requiring consideration for the issuance of stock in a Delaware corporation.

8. Niederer had been a director of Hunter in 1977 and 1978, but resigned on February 9, 1979. He did not become a Hunter director again until March 17, 1980. However, from time to time since 1977 Niederer has acted as a banking and financial consultant to the Bugnones and Hunter.

Zurich, Switzerland, never having been physically present in Delaware.

In addition to the foregoing, the parties have stipulated that:

(i) Niederer represented Tools as its agent at each stage of the transaction;

(ii) Niederer, Tools, Hunter and Efday knew that the plan would diminish plaintiff IBI's interest in Hunter from 100% to 5%.

(iii) Niederer knew of the corporate steps Hunter would be required to undertake to create the 190,000 shares, including the filing of a certificate of amendment with the Secretary of State of Delaware;

(iv) Tools made an offer to buy 190,000 shares of Hunter at a time when it and Niederer knew that Hunter had only 25,000 authorized shares and that all 10,000 shares which had been issued had been deposited with Finter Bank pursuant to the agreement between IBI and Efday and could not be transferred by Efday without the certificate being released by Finter Bank.[9]

In his opinion, the Chancellor found no "minimum contact" connection between defendants Tools and Niederer and the State of Delaware. He specifically concluded that the exercise of jurisdiction over these defendants on the basis of an alleged conspiracy which took place in Europe would violate traditional notions of fair play and substantial justice and that Tools and Niederer could not have reasonably anticipated being haled before the Delaware courts as a result of this alleged conspiracy.[10] Moreover, the mere purchase of shares of Hunter, a Delaware corporation, by Tools would not subject Tools to the jurisdiction of the Court. In addition to the failure to obtain jurisdiction over Tools, the Court held that the plaintiff could not obtain jurisdiction over or properly serve the defendant Niederer.

erer. The Court indicated that dismissal of the complaint was mandated because of the inability of the Court to exercise jurisdiction over Tools, an indispensable party to the action.

Appellant contends that Delaware can constitutionally exercise *quasi in rem* jurisdiction over an absent defendant's property located in Delaware, so long as the property is the subject matter of the underlying litigation. It also contends that Delaware's strong interest in regulating the *res* (shares of a Delaware corporation), in conjunction with the fact that the *res* by statute is present in the jurisdiction, supplies sufficient contacts with the State to justify the assertion of *quasi in rem* jurisdiction. According to appellant, the exercise of *quasi in rem* jurisdiction is also fortified by the fact that Delaware is the only forum that can grant relief by cancellation of the shares. Even if this case is not distinguishable from *Shaffer v. Heitner*, 433 U.S. 186, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977) on the latter basis, appellant argues that there are additional contacts between the defendant and the forum which exist as a result of a conspiracy between the defendants to utilize the laws of the State of Delaware to defraud IBI. Finally, appellant asserts that Niederer was properly served pursuant to Delaware's director consent statute. For these reasons, appellant believes that the dismissal of the complaint was improper.

In contrast, appellees make the following arguments. First, defendant Tools does not have sufficient minimum contacts with the jurisdiction to meet the test set forth in *Shaffer v. Heitner*. This conclusion is supported by the fact that the fictional situs of the shares in this jurisdiction does not supply the necessary minimum contacts; Dela-

**9.** It is undisputed that: Niederer is a Swiss citizen and has never been in Delaware; Tools is a Dutch company that is not qualified to do business in Delaware; and that neither defendant has a place of business in Delaware nor does any business in this State.

**10.** The Court found this conclusion supported by the fact that the pledge agreement was entered into in a foreign country and that its validity and enforceability depended on the law

of the country in which it was entered. The Chancellor also found that Tools and Niederer may both be sued in Europe, a conclusion we accept on the present record. We again decline to address the significance of the absence, if it be so, of any other American forum. See *Papendick v. Bosch*, Del.Supr., 410 A.2d 148, 153 (1979), cert. denied 446 U.S. 909, 100 S.Ct. 1837, 64 L.Ed.2d 262 (1980).

ware has no special interest in the issues in this case because the validity and enforceability of the pledge is dependent on the law of a foreign country; and Delaware is not the only available forum to hear this dispute. It is also inappropriate to assert jurisdiction over defendants on a conspiracy theory because this theory has been rejected by several courts, and adoption of the theory would have the unfair result of making the defendants come to the jurisdiction and defend on the merits prior to a determination of whether Delaware courts have jurisdiction. Tools and Niederer have not, by their actions, purposefully availed themselves of the benefits and protection of Delaware law, and thus, there is no constitutional basis for jurisdiction over them. Besides his lack of minimum contacts to the State of Delaware, Niederer was not subject to service under the Delaware director consent statute or the long-arm statute. Finally, since Tools is an indispensable party to this action, the failure or inability to acquire jurisdiction over it compels dismissal of this case.

## II

As we see the case, in the historical development of state court jurisdiction, the first question to be addressed is whether Tools, a Dutch company, is subject to jurisdiction because it has purchased shares in Hunter, a Delaware corporation, which shares are the subject of the lawsuit brought by IBI. This first question relates to the post *Shaffer* viability of 10 *Del.C.* § 365, the *in rem* jurisdictional statute, under these facts, i.e. when the intangible property used for jurisdictional purposes is the subject matter of

the lawsuit. The jurisdictional statute in turn rests on the section in our corporation law making "the situs of the ownership of the capital stock [of Delaware corporations in Delaware]." 8 *Del.C.* § 169.

Appellant argues this case is distinguishable from *Shaffer* because in *Shaffer* the Court invalidated the exercise of *quasi in rem* jurisdiction [11] by a state court over property which is not the subject matter of the litigation, and which is unrelated to the underlying cause of action. In contrast, IBI argues, the relief sought in this case is the cancellation of the very same shares that form the basis of *quasi in rem* jurisdiction. IBI further argues that such shares were issued as the result of an allegedly fraudulent scheme to deprive IBI of its security interest. Thus, appellant contends that the assertion of *quasi in rem* jurisdiction over the property interest held by Tools is constitutionally valid. If appellant is correct in its initial position, *quasi in rem* jurisdiction here, with regard to the interest of Tools in Hunter, would survive *Shaffer* without reference to conspiracy. It is our function to examine the issue in accord with the constitutional decisions of the United States Supreme Court.

Although the appellant may be correct that the narrow holding of the Court in *Shaffer* only precluded the exercise of *quasi in rem* jurisdiction over property which is totally unrelated to the litigation, as we see it, appellant's position ignores the major thrust of the Court's reasoning in *Shaffer*.

*Shaffer v. Heitner* effectively overruled a century of case law based upon the Court's decision in *Pennoyer v. Neff*, 95 U.S. 714, 24

11. The Court in *Shaffer* described the differences between *in rem* and *quasi in rem* jurisdiction as follows:

" 'A judgment *in rem* affects the interests of all persons in designated property. A judgment *quasi in rem* affects the interests of particular persons in designated property. The latter is of two types. In one the plaintiff is seeking to secure a pre-existing claim in the subject property and to extinguish or establish the nonexistence of similar interests of particular persons. In the other the plaintiff seeks to apply what he concedes to be the property of the defendant to the satisfaction of a claim

against him. Restatement, Judgments, 5–9.' " 433 U.S. at 199 n. 17, 97 S.Ct. at 2577.

Under this definition, the present case would appear to be *quasi in rem* of the first type. It should be noted that the first type is close to a true *in rem* case in that title to specific property is at issue. *Shaffer* involved the second type. It should also be noted that *Shaffer* involved our sequestration statute, 10 *Del.C.* § 366. But for purposes of minimum contacts to justify substituted service, the principle of law is the same. *Tuckman v. Aerosonic Corp.*, Del.Ch., 394 A.2d 226, 229 (1978).

L.Ed. 565 (1878). Justice Field in *Pennoyer* recognized two "established principles of public law". The first was that "every State possesses exclusive jurisdiction and sovereignty over persons and property within its territory." The second was that "no State can exercise direct jurisdiction and authority over persons or property without its territory." 95 U.S. at 722.

The limitation of the territorial theory of jurisdiction was seriously eroded in the area of *in personam* jurisdiction by the Court's decision in *International Shoe Co. v. State of Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945). But the expansive territorial power theory remained valid in cases involving the exercise of *in rem* and *quasi in rem* jurisdiction until the Court's decision in *Shaffer v. Heitner* in 1977. The two concepts came together. *In personam* jurisdiction broadened beyond personal presence. *In rem* jurisdiction narrowed from a bare property presence.

Specifically, instead of continuing to apply the *Pennoyer* reasoning to *in rem* and *quasi in rem* cases, the Court in *Shaffer* adopted the same due process standard applied to *in personam* cases in *International Shoe*.[12] According to the Court in *International Shoe*, pursuant to the Due Process Clause, a defendant, who is not physically present in the forum, may still be subjected to *in personam* jurisdiction if he has "certain minimum contacts with it such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" 326 U.S. at 316, 66 S.Ct. at 158. As such, the Court concluded that the determinative question is not limited to whether the defendant is "present" in the jurisdiction. It can turn on whether the defendant has such ties to the forum state "as to make it reasonable in the context of our federal system of government to require the [defendant] to defend the particular suit which is brought there." 326 U.S. at 317, 66 S.Ct. at 158. In making this determination, it is "the quality and nature

of the activity" that is determinative. 326 U.S. at 319, 66 S.Ct. at 160.

After the decision in *International Shoe*, the Court explained and limited the minimum contacts standard in *Hanson v. Denckla*, 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958), wherein the Court stated:

"The application of [the minimum contacts] rule will vary with the quality and nature of the defendant's activity, but it is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." 357 U.S. at 253, 78 S.Ct. at 1240.

In *Shaffer*, the Court took these rules, developed in personal jurisdiction cases to permit a broader exercise of *in personam* jurisdiction by the state courts, and adapted them as a limitation in *in rem* and *quasi in rem* actions. The first step taken by the Court in applying the minimum contacts test in this context was to dispel the fiction supported by *Pennoyer*, that a court exercises jurisdiction over a thing. In reality, the Court stated, a court exercises "jurisdiction over the interests of persons in a thing." 433 U.S. at 207, 97 S.Ct. at 2581. According to *Shaffer*, the central focus of the *International Shoe* standard is "the relationship among the defendant, the forum, and the litigation, rather than the mutually exclusive sovereignty of the States . . . ." 433 U.S. at 204, 97 S.Ct. at 2580. Consequently, the Court concluded that "all assertions of state-court jurisdiction must be evaluated according to the standards set forth in *International Shoe* and its progeny." 433 U.S. at 212, 97 S.Ct. at 2584.

Despite this apparently clear mandate, several isolated statements in the opinion have given rise to questions concerning the scope of the Court's ruling in *Shaffer*. For example, the express holding in *Shaffer* only held *quasi in rem* jurisdiction unconsti-

---

**12.** This Court has, on recent occasions, examined and discussed *Shaffer v. Heitner* and the minimum contacts due process test for the exercise of state court jurisdiction over nonresi-

dent directors and corporate defendants. See *Armstrong v. Pomerance*, Del.Supr., 423 A.2d 174 (1980); and *Papendick v. Bosch*, Del.Supr., 410 A.2d 148 (1979).

tutional where the *res* is "completely unrelated" to the litigation. 433 U.S. at 209, 97 S.Ct. at 2582. After stating that the *International Shoe* "minimum contacts" test was the proper standard for determining whether the exercise of jurisdiction over the interests of persons in a thing is consistent with due process, the Court added that:

> "This argument, of course, does not ignore the fact that the presence of property in a State may bear on the existence of jurisdiction by providing contacts among the forum State, the defendant, and the litigation. For example, when claims to the property itself are the source of the underlying controversy between the plaintiff and the defendant, it would be unusual for the State where the property is located not to have jurisdiction." 433 U.S. at 207, 97 S.Ct. at 2581.

The Court provided a footnote to this section which reads, "This category includes true *in rem* actions and the first type of *quasi in rem* proceedings." 433 U.S. at 207 n. 24, 97 S.Ct. at 2581. This footnote made reference to a preceding footnote which defined the first type of *quasi in rem* proceeding as one in which

> "the plaintiff is seeking to secure a preexisting claim in the subject property and to extinguish or establish the nonexistence of similar interests of particular persons." 433 U.S. at 199 n. 17, 97 S.Ct. at 2577.

And, while applying the applicable law to the facts in the case, the Court noted that the property over which Delaware attempted to assert jurisdiction was "not the subject matter of [the] litigation, nor [was] the underlying cause of action related to the property." 433 U.S. at 213, 97 S.Ct. at 2584.

From these statements, some have speculated that *Shaffer* can be limited to its specific facts. As has been noted, appellants argue here that *Shaffer* is not controlling in a situation where the underlying *res* is the subject of, or intimately related to, the cause of action. Although this interpretation remains possible after the *Shaffer* opinion, subsequent Supreme Court opinions have shed further light on the *Shaffer* rul-

ing. The possible blanket exception that was left open in *Shaffer* has at least been narrowed. Later opinions emphasize that *all* assertions of state court jurisdiction must be examined according to the *International Shoe* standard. But the presence within the forum state of property in which defendants claim an interest can provide a contact of significance.

The first of these cases is *Kulko v. Superior Court of California*, 436 U.S. 84, 98 S.Ct. 1690, 56 L.Ed.2d 132 (1978). In *Kulko*, the Court acknowledged that the minimum contacts standard is somewhat difficult to apply. Indeed, the Court stated: "We recognize that this determination is one in which few answers will be written 'in black and white. The grays are dominant and even among them the shades are innumerable.'" 436 U.S. at 92, 98 S.Ct. at 1697, quoting *Estin v. Estin*, 334 U.S. 541, 545, 68 S.Ct. 1213, 1216, 92 L.Ed. 1561 (1948). The Court did state, however, that due process required (1) "reasonable notice to the defendant that an action has been brought"; and (2) "a sufficient connection between the defendant and the forum state to make it fair to require defense of the action in the forum." 436 U.S. 91, 98 S.Ct. at 1696. The Court stressed the importance of the examination of contacts between the defendant and the forum by stating:

> "While the interests of the forum State and of the plaintiff in proceeding with the cause in the plaintiff's forum of choice are, of course, to be considered, see *McGee v. International Life Insurance Co.*, 355 U.S. 220, 223, 78 S.Ct. 199, 201, 2 L.Ed.2d 223 (1957), an essential criterion in all cases is whether the 'quality and nature' of the defendant's activity is such that it is 'reasonable' and 'fair' to require him to conduct his defense in that State." 436 U.S. at 92, 98 S.Ct. at 1697.

Further discussion is found in two companion cases recently decided by the Supreme Court, *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980) and *Rush v. Savchuk*, 444 U.S. 320, 100 S.Ct. 571, 62 L.Ed.2d 516 (1980). In *World-Wide*, the

Court addressed the question of due process limitations on the exercise of *in personam* jurisdiction by state courts. The Court focused, in part, upon the purposes behind the minimum contacts test, which are twofold: (1) to protect "the defendant against the burdens of litigating in a distant or inconvenient forum"; and (2) "to ensure that States through their courts, do not reach out beyond the limits imposed on them by their status as coequal sovereigns in a federal system." 444 U.S. at 292, 100 S.Ct. at 564. To protect defendants from being forced to defend actions in an inconvenient forum, the court examines the defendant's contacts in terms of "reasonableness" or "fairness". 444 U.S. at 292, 100 S.Ct. 564. And implicit in this concept of reasonableness is an examination of factors beyond merely the defendant's contacts with the forum. For example, the Court states:

"Implicit in this emphasis on reasonableness is the understanding that the burden on the defendant, while always a primary concern, will in an appropriate case be considered in light of other relevant factors, including the forum State's interest in adjudicating the dispute, see *McGee v. International Life Ins. Co.*, 355 U.S. 220, 223, 78 S.Ct. 199, 201, 2 L.Ed.2d 223 (1957); the plaintiff's interest in obtaining convenient and effective relief, see *Kulko v. California Superior Court, supra*, 436 U.S., at 92, 98 S.Ct., at 1697, at least when that interest is not adequately protected by the plaintiff's power to choose the forum, cf. *Shaffer v. Heitner*, 433 U.S. 186, 211, n. 37, 97 S.Ct. 2569, 2583, n. 37, 53 L.Ed.2d 683 (1977); the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and the shared interest of the several States in furthering fundamental substantive social policies, see *Kulko v. California Superior Court, supra*, 436 U.S., at 93, 98, 98 S.Ct., at 1697, 1700." 444 U.S. at 292, 100 S.Ct. at 564–65.

But regardless of these considerations, the Due Process Clause prohibits the exercise of *in personam* jurisdiction where the requisite minimum contacts between the defendant and the jurisdiction are not present. As the Court stated:

"Thus, the Due Process Clause 'does not contemplate that a state may make binding a judgment *in personam* against an individual or corporate defendant with which the state has no contacts, ties, or relations.' *International Shoe Co. v. Washington*, 326 U.S. at 319, 66 S.Ct. at 159. Even if the defendant would suffer minimal or no inconvenience from being forced to litigate before the tribunals of another State; even if the forum State has a strong interest in applying its law to the controversy; even if the forum State is the most convenient location for litigation, the Due Process Clause, acting as an instrument of interstate federalism, may sometimes act to divest the State of its power to render a valid judgment." 444 U.S. at 294, 100 S.Ct. at 565–66.

It seems clear, given *World-Wide*, that regardless of the contacts between the plaintiff and the forum, and the interest of the forum state in the litigation, due process prevents the assertion of *in personam* jurisdiction if no significant contacts or ties exist between the defendant and the forum.

For the first time since *Shaffer*, the Supreme Court applied these principles to a *quasi in rem* action in *Rush v. Savchuk, supra*. In *Rush* the parties, who at the time of the accident were both residents of Indiana, were involved in an automobile accident in that state.[13] Before the action was filed, however, Savchuk moved to Minnesota and filed suit there. Because Rush had no contacts to Minnesota that would support the assertion of *in personam* jurisdiction over him, Savchuk attempted to obtain *quasi in rem* jurisdiction by garnishing the contractual obligation of State Farm Mutual Automobile Insurance Co. "to defend and indemnify Rush in connection with such a suit." 444 U.S. at 322, 100 S.Ct. at 574. The Minnesota Supreme Court recognized that there was insufficient voluntary activity to justify *in personam* jurisdiction. "The Court found, however, that considerations

---

**13.** Appellee Savchuk was a guest in the automobile driven by appellant Rush.

of fairness supported the exercise of *quasi in rem* jurisdiction because in accident litigation the insurer controls the defense of the case, . . . does business in and is regulated by the State, and the State has an interest in protecting its residents and providing them with a forum in which to litigate their claims." 444 U.S. at 324, 100 S.Ct. at 575. Rush appealed and the Supreme Court vacated the judgment of the Minnesota Supreme Court and remanded the case for consideration in light of *Shaffer*. 444 U.S. at 324, 100 S.Ct. at 575.

On remand, the Minnesota Supreme Court held that the exercise of *quasi in rem* jurisdiction by the garnishment of the insurer's contractual obligation met the due process standards set forth in *Shaffer*, and further found the case distinguishable from *Shaffer* in that "the garnished property was intimately related to the litigation and the garnishment procedure paralleled the asserted state interest in 'facilitating recoveries for resident plaintiffs.'" 444 U.S. at 324, 100 S.Ct. at 575. Rush once again appealed and the Supreme Court again reversed.

As in *World-Wide* and *Shaffer*, the Supreme Court again emphasized that "'*all* assertions of state-court jurisdiction must be evaluated according to the standards set forth in *International Shoe* and its progeny.'" 444 U.S. at 327, 100 S.Ct. at 577 (emphasis added). And according to the Court, the central focus of the inquiry is "'the relationship among the defendant, the forum, and the litigation.'" 444 U.S. at 327, 100 S.Ct. at 577. The Court noted that presence of the property in the jurisdiction is merely one tie, and that it may, however, suggest other ties. The Court recognized that all the justifications for permitting jurisdiction in a case such as this shifted "the focus of the inquiry from the relationship among the defendant, the forum, and the litigation to that among the plaintiff, the forum, the insurer, and the litigation." 444 U.S. at 332, 100 S.Ct. at 579. This shift in focus, in the opinion of the Court, was prohibited by *International Shoe* and its progeny. *Id.* Finding no contacts between the defendant and the forum, the Court reversed the judgment of the Minnesota Supreme Court.[14]

From the foregoing cases, we conclude that the *International Shoe* doctrine is applicable to all assertions of state court jurisdiction. Moreover, at least with regard to intangible property, there is considerable doubt if there is a general exception for *quasi in rem* cases even when the property in question is intimately related to or is the subject matter of the litigation. We note particularly the *Shaffer* majority opinion, and its reference to jurisdiction based "solely on the statutory presence of appellants' property in Delaware" [433 U.S. at 213, 97 S.Ct. at 2584] and its conclusion that appellants "did not by acquiring [a stock interest in a Delaware corporation] surrender their right to be brought to judgment only in States with which they had 'minimum contacts.'" [433 U.S. at 216, 97 S.Ct. at 2586]. Caution must be exercised as to a fictional statutory presence of property. *Arden-Mayfair, Inc. v. Louart Corp.*, Del.Ch., 385 A.2d 3, 6 (1978). The requisite contacts between the defendant, the litigation and the forum state must exist. Moreover, the Due Process Clause may prevent the exercise of jurisdiction over the person's interest

14. Despite the apparently all inclusive language of the opinion, the opinion still leaves room for speculation about the existence of a *quasi in rem* exception to Shaffer. Notwithstanding language that all assertions of state court jurisdiction must meet the standards set forth in *Shaffer*, and that the contacts between the defendant and the forum are determinative regardless of the forum's or plaintiff's interest in the litigation, the Court said that

"Nor are there significant contacts between the litigation and the forum . . . . The insurance policy is not the subject matter of the case, however, nor is it related to the operative facts of the negligence action. The contractual arrangements between the defendant and the insurer pertain only to the conduct, not the substance of the litigation, and accordingly do not affect the court's jurisdiction unless they demonstrate ties between the defendant and the forum." 444 U.S. at 329, 100 S.Ct. at 577–78.

Thus, although the language of the opinion does not suggest the existence of an exception to *Shaffer*, the explicit holding does not preclude one.

in the property located in the forum state, despite the existence of a strong interest by the forum state in the litigation. Again, the majority opinion in *Shaffer* paid little heed, as a jurisdictional matter as opposed to a choice of law matter, to the legitimate Delaware interest in an intra-corporate dispute. 433 U.S. at 215, 97 S.Ct. at 2585. Compare Justice Brennan's dissent, 433 U.S. at 227–28, 95 S.Ct. at 2589. Compare also *Greyhound Corporation v. Heitner*, Del. Supr., 361 A.2d 225, 235–36 (1976). Therefore, we return to the proposition that a state court can exercise *quasi in rem* jurisdiction over the property of a defendant only if the nature and quality of defendant's contacts with the forum state are such that it is reasonable and fair to require him to defend an action in that state. While the existence of property in the state is one contact to the jurisdiction, and in some cases it may suggest other contacts, in and of itself, mere ownership in the forum of property related to the litigation is not necessarily sufficient under the *International Shoe* standard. See *Tuckman v. Aerosonic Corp.*, Del.Ch., 394 A.2d 226, 228–29 (1978) and the unreported decision of *Bolger v. Northern Lumber Co.*, Del.Ch., N.C., C.A. 5328, 4 Del.J.Corp.Law 268 (April 13, 1978), a share cancellation case, cited therein. See also *Barber-Greene Co. v. Walco National Corp.*, D.Del., 428 F.Supp. 567 (1977).

Relating the general discussion above to the facts of this case, we are not satisfied that the United States Supreme Court would hold that the statutory situs of the stock in Delaware provides such minimum contact by its record owner, the defendant Tools, to justify the maintenance of this lawsuit against Tools in Delaware. Our uncertainty exists notwithstanding the fact that the stock is the subject matter of the lawsuit, notwithstanding the fact that the Delaware Court of Chancery would be best able to tailor an efficient and speedy remedy, notwithstanding the fact that the case involves international, and not merely interstate, parties and activity, and notwithstanding the fact that Delaware has a vital interest in the prevention of abuse in the administration of its corporate law.

Having addressed the first question, we will retreat from a definitive decision on it. In light of the conspiracy aspect of this case, we are not compelled to definitively rule on it and we do not. Given the possibility of factual disputes with regard to the conspiracy allegations, however, we note that we are inclined to the view, on the present state of the law, as set forth by the United States Supreme Court, that the statutory situs of the stock in Delaware coupled with our *in rem* jurisdictional statute, § 365, would not constitutionally confer on Delaware jurisdiction over Tools in a suit to cancel the stock of Hunter now held by Tools.

### III

We turn then to IBI's second theory based on additional contacts in the stipulation of facts. IBI contends that the involvement of the defendants in a conspiracy to defraud IBI by depriving it of its security interest in Hunter was sufficient connection with Delaware to confer jurisdiction over the defendants. In essence, this theory can be explained as follows. First, the acts of each co-conspirator are attributable to each of the other co-conspirators. Therefore, any act by a conspirator in furtherance of the conspiracy which takes place in the jurisdiction is attributable to the other conspirators. Consequently, if the purposeful act or acts of one conspirator are of a nature and quality that would subject the actor to the jurisdiction of the court, all of the conspirators are subject to the jurisdiction of the court.

The conspiracy theory of jurisdiction has not been adopted in all jurisdictions and at present there is a clear divergence of authority on whether participation in a conspiracy will give rise to jurisdiction over the nonresident co-conspirator. Of course the conspiracy facts are cumulative to the statutory presence of the stock and the cancellation nature of the lawsuit.

### A

An apparent majority of cases in the last decade have recognized the existence of the

conspiracy theory of jurisdiction, but because the cases generally involve mixed questions of state law and federal constitutional law,[15] the quantum of proof required to justify the exercise of jurisdiction over absent co-conspirators has varied from case to case.

Some cases have required a minimal showing for the exercise of this type of jurisdiction. One of the first cases applying a simple conspiracy test was *Maricopa County v. American Petrofina, Inc.*, N.D. Ark., 322 F.Supp. 467 (1971). In *Maricopa* the plaintiffs alleged a conspiracy, in violation of the Clayton Act, to fix prices of asphalt in Arizona. One defendant, a resident of Los Angeles, filed an affidavit stating that he did not reside in, maintain an office in, transact business in, or have an agent in the State of Arizona. Finding that the court in Arizona did have jurisdiction to hear the case, the Court stated that, "A conspiracy, no matter where made, creates a destructive force which extends into the state", and that the real and intangible forces affecting the state meet the due process minimum contacts standards. 322 F.Supp. 469. The Court distinguished another case by stating that in the other case no event occurred in the forum state and no effect was felt there. *Id.* Thus, according to the court in *Maricopa*, the only showing that was required to meet due process standards was an allegation of the existence of a conspiracy in conjunction with an allegation of some act or event within the state.

Similarly, the District of Columbia reached the same result on a minimal showing in *Mandelkorn v. Patrick*, D.D.C., 359 F.Supp. 692 (1973).[16] Several of the defendants argued that they lacked "minimum contacts" for the exercise of jurisdiction under the *International Shoe* standard. In finding that the long arm statute had been properly invoked, the Court quoted the following passage from *Hoffman v. Halden*, 268 F.2d 280, 295–296 (9th Cir. 1959).

"If sufficient allegations appear of the acts of one defendant among the conspirators, causing damage to the plaintiff, and the act of the particular defendant was done pursuant to the conspiracy, during its course, in furtherance of the objects of the conspiracy, with the requisite purpose and intent ... then all defendants are liable for acts of the particular defendant under the general principle of agency on which conspiracy is based."

The Court went on to state that the mere presence of one conspirator in the jurisdiction was not enough to establish jurisdiction over the absent co-conspirators; there must be at least one act in furtherance of the conspiracy by one of the co-conspirators in the jurisdiction. 359 F.Supp. 696. Later the Court specifically rejected authority from other jurisdictions which require a factual showing of conspiracy at the pleading stage.[17]

Most cases which have accepted the conspiracy theory of jurisdiction have required a more extensive showing than the aforementioned cases. For example, some courts have required proof of additional elements concerning knowledge, participation, causation, foreseeability, direction and control. The seminal line of authority requiring a higher burden of proof are the *Leasco* cases: *Leasco Data Processing Equipment Corp. v. Maxwell*, S.D.N.Y., 319 F.Supp. 1256 (1970) (*Leasco I*); *Leasco Data Pro-*

15. For instance, virtually all the cases involve an attempt to use a state long arm statute to achieve personal jurisdiction over the nonresident co-conspirator. Thus, in addition to applying due process standards, the courts must construe the state long arm statute to see if service was proper under the statute. See e.g. *Dixon v. Mack*, 507 F.Supp. 345 (1980), *Socialist Party v. Attorney Gen.*, 375 F.Supp. 318 (1974), *Turner v. Baxley*, 354 F.Supp. 963 (1972).

16. The plaintiff in *Mandelkorn* was a member of a religious group who filed a class action alleging a conspiracy on the part of the defendants to deprive her and the members of the class of various constitutional rights including freedom of speech, religion, association and travel.

17. Specifically, the court rejected the factual showing required by *Leasco Data Processing Equipment Corp. v. Maxwell*, S.D.N.Y., 319 F.Supp. 1256 (1970). This opinion is discussed *infra.*

cessing Equipment Corp. v. Maxwell, 2d Cir., 468 F.2d 1326 (1972) (*Leasco II*); and *Leasco Data Processing Equipment Corp. v. Maxwell*, S.D.N.Y., 68 F.R.D. 178 (1974) (*Leasco III*). In *Leasco I*, the Court stated that a bare allegation of conspiracy is insufficient to confer jurisdiction. A plaintiff must make a factual showing of: (1) the existence of a conspiracy; and (2) the connection between the nonresident co-conspirator and the acts of the conspirator who is present in the jurisdiction.[18] 319 F.Supp. at 1261. This connection must be of such a nature that defendant can be said to be deliberately engaged in activities in the jurisdiction through his agent. Applying these principles, the Court *inter alia* granted one defendant's motion to dismiss on the grounds that an insufficient showing had been made to establish personal jurisdiction over him.

On appeal, however, the Second Circuit found the dismissal improper because of conflicting testimony in the affidavits, and remanded the case. *Leasco II*, 468 F.2d at 1333–34. In the appeal, the Court modified the test used by the court below. According to the Court, to achieve jurisdiction over a conspirator,

> "The person sought to be charged must know, or have good reason to know, that his conduct will have effects in the state seeking to assert jurisdiction over him."

468 F.2d 1341. *Accord Turner v. Baxley*, D.Vt., 354 F.Supp. 963 (1972). Moreover, the effect or effects in the forum state must occur "as a direct and foreseeable result of the conduct outside the territory." 468 F.2d at 1341. On remand, using this modified test, the District Court found insufficient purposeful activity on the part of the particular defendant to justify the exer-

cise of *in personam* jurisdiction over him. *Leasco III*, 68 F.R.D. at 184.

Other courts have required a showing of additional factors beyond mere allegations of conspiracy and an act. For example, the Court in *Gemini Enterprises v. W.F.M.Y. Television Corp.*, M.D.N.C., 470 F.Supp. 559 (1979), used a test similar to the one applied in the *Leasco II*, but required that the act in the forum jurisdiction be a *substantial* act. Possibly the most stringent test was applied by the court in *Dixon v. Mack*, S.D.N.Y., 507 F.Supp. 345 (1980). In order to gain personal jurisdiction over the defendant, according to the *Dixon* Court, the plaintiff must make a *prima facie* factual showing: (1) of the existence of a conspiracy; (2) that the defendant was a member of that conspiracy; and (3) of a connection between the defendant and the transaction in the forum state. But in addition, the Court cited New York precedent indicating that to invoke the conspiracy theory of jurisdiction: (a) the defendant must be aware of the effects on the forum state; (b) the defendant must derive some benefit from the activity; and (c) the out-of-state conspirators must have exercised direction or control over the in-state co-conspirators.[19]

Other cases, relied upon by the defendants, have rejected the conspiracy theory of jurisdiction. *Cascade Steel v. C. Itoh & Co.*, D.Ore., 499 F.Supp. 829 (1980); *I. S. Joseph Co. Inc. v. Mannesmann Pipe & Steel Co.*, D.Minn., 408 F.Supp. 1023 (1976); *Kipperman v. McCone*, N.D.Cal., 422 F.Supp. 860, n. 14 (1976). Each of these cases, however, relies upon, or draws an analogy to, antitrust cases in which the courts rejected the conspiracy theory for the purposes of establishing venue in Clayton Act cases. In general, these cases do not analyze nonantitrust cases which have adopted the conspiracy

---

18. The requirement of a factual showing beyond unsupported allegations has also been adopted in other cases. *See e.g. Chrysler Corp. v. Fedders Corp.*, 6th Cir., 643 F.2d 1229, 1237 (1981); *Dixon v. Mack*, S.D.N.Y., 507 F.Supp., 345, 348 (1980); *McLaughlin v. Copeland*, D.Md., 435 F.Supp. 513, 530 (1977); *Ghazoul v. International Management Services Inc.*, S.D. N.Y., 398 F.Supp. 307, 312 (1975).

19. It should be noted that these elements were required not only to satisfy due process requirements but were also requirements derived from New York decisions construing that state's long arm statute. Indeed, the court later indicated that the facts indicating that the defendant had voluntarily joined the conspiracy with knowledge that an overt act would be taken in the jurisdiction was sufficient to meet the due process minimum contacts test.

theory of jurisdiction, and these cases make only passing reference, if any, to the minimum contacts due process criteria of *International Shoe.*[20]

We decline to follow the line of cases based in antitrust law cited by the defendants. A fair reading of *Bankers Life and Casualty Co. v. Holland*, 346 U.S. 379, 74 S.Ct. 145, 98 L.Ed. 106 (1953), and the other antitrust venue cases, indicates that the venue provision of the Clayton Act is based upon special policy considerations which differ from those underlying the minimum contacts due process test. Moreover, we are convinced the conspiracy theory has merit. For these reasons, we reject the authority submitted by the defendants in this context. We, as a general matter, follow what we believe to be the better rule. We find that, under certain circumstances, the voluntary and knowing participation of an absent nonresident in a conspiracy with knowledge or reason to know of an act or effect in the jurisdiction can be sufficient to supply or enhance the contacts required with the jurisdiction for jurisdictional purposes.

B

■ To our knowledge, the United States Supreme Court, as yet, has not definitively examined the conspiracy theory of jurisdiction. We must therefore attempt to formulate a workable standard, recognizing that evolution will inevitably call for refinement. The conspiracy theory rests in part upon the legal premise that the acts of a conspirator are imputed to all the other co-conspirators. We believe a strict test, modeled after the ones used in cases which have previously recognized the conspiracy theory of jurisdiction, withstands due process scrutiny. We therefore hold that a conspirator who is absent from the forum state is subject to the jurisdiction of the court, assuming he is properly served under state law, if the plaintiff can make a factual showing that: (1) a conspiracy to defraud existed; (2) the defendant was a member of that conspiracy; (3) a substantial act or substantial effect in furtherance of the conspiracy occurred in the forum state; (4) the defendant knew or had reason to know of the act in the forum state or that acts outside the forum state would have an effect in the forum state; and (5) the act in, or effect on, the forum state was a direct and foreseeable result of the conduct in furtherance of the conspiracy.

Thus, a defendant who has so voluntarily participated in a conspiracy with knowledge of its acts in or effects in the forum state can be said to have purposefully availed himself of the privilege of conducting activities in the forum state, thereby fairly invoking the benefits and burdens of its laws. Compare *Papendick v. Bosch*, Del.Supr., 410 A.2d 148, 153 (1979). It can further be said that such participation is a substantial contact with the jurisdiction of a nature and quality that it is reasonable and fair to require the defendant to come and defend an action there. Additional contacts would of course make even more equitable the jurisdiction.

C

The motion to dismiss by Tools was based upon lack of jurisdiction over it. The motion also sought to quash service of process. Hunter's motion to dismiss was based upon the inability to join Tools, an indispensable party.[21] Because resolution of the motions of Tools and Hunter both turn on whether

---

20. In *Mendelkorn v. Patrick*, 359 F.Supp. 691, 692 (1973), the court in a footnote expressly distinguished cases adopting the conspiracy theory of jurisdiction and Clayton Act cases that have rejected this doctrine. It should also be noted that the Sixth Circuit was recently faced with this issue in a Clayton Act case and after discussing cases adopting and rejecting the conspiracy theory of jurisdiction, the court refused to expressly adopt or reject the theory because the plaintiffs' allegations of conspiracy were not supported by factual assertions. *Chrysler Corp. v. Fedders Corp.*, 643 F.2d 1229 (1981). Thus, the applicability of cases rejecting the theory outside of the Clayton Act context is questionable at best.

21. As noted by the Chancellor, since Efday subsequently answered the complaint, we consider the motion as concerning only Tools.

or not the Court can assert jurisdiction over Tools, we will consider them together.

■ Court of Chancery Rule 19 reads in pertinent part:

"(a) Persons to Be Joined if Feasible. A person who is subject to service of process and whose joinder will not deprive the Court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in his absence complete relief cannot be accorded among those already parties, or (2) he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may (i) as a practical matter impair or impede his ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of his claimed interest. If he has not been so joined, the Court shall order that he be made a party. If he should join as a plaintiff but refuses to do so, he may be made a defendant, or in a proper case, an involuntary plaintiff. If the joined party objects to venue and his joinder would render the venue of the action improper, he shall be dismissed from the action.

(b) Determination by Court Whenever Joinder Not Feasible. If a person as described in paragraph (a)(1) and (2) hereof cannot be made a party, the Court shall determine whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed, the absent person being thus regarded as indispensable. The factors to be considered by the Court include: First, to what extent a judgment rendered in the person's absence might be prejudicial to him or those already parties; second, the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; third, whether a judgment rendered in the person's absence will be adequate; fourth, whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder."

Tools, as the current owner of the shares which plaintiff IBI seeks to have canceled, clearly has an interest relating to the subject matter of the action such that disposition of the action in its absence as a practical matter may impair or impede its ability to protect that interest. Thus, Tools meets the criterion set forth in Rule 19 for an indispensable party, and if Tools cannot be joined, equity and good conscience mandate that the complaint be dismissed.

In determining whether IBI has made a sufficient factual showing to invoke jurisdiction over Tools under the conspiracy theory, we look to the stipulation of facts agreed upon by the parties solely for the purpose of deciding their motions.[22] Applying the foregoing legal principles to the stipulated facts, we find: (1) that a conspiracy to authorize and issue new shares of Hunter for the purpose of diminishing the plaintiff's security interest did exist;[23] (2) that Tools was a member of that conspiracy; in fact, the Unanimous Consent of Hunter's Sole Shareholder, Efday, which authorized the amendment to the certificate of incorporation recites that an offer to buy 190,000 shares of the stock of Hunter had been received before the shares in question had been issued, or even authorized; (3)

---

**22.** The stipulation states that, "IT IS HEREBY STIPULATED AND AGREED, by and among the undersigned attorneys, that without prejudice to any party's right to assert a contrary or inconsistent position on the merits or for other purposes unrelated to the pending motions, the following shall be deemed to be true solely for purposes of defendants' motions to dismiss and this Court's rulings on those motions; . . . ." In effect, certain facts, adverse to the defendants, were assumed by the Court of Chancery for the purpose of the motions.

**23.** We recognize the defendants' argument that applicable foreign law permits the willful dilution of plaintiff's interest. It is premature to resolve all the choice of law questions and to determine foreign law if applicable. We decline to do so at this stage in the proceedings. The stipulated facts justify the conclusion that the defendants acted willfully to damage the property interest of the plaintiff. That factual base is sufficient to litigate.

that the certificate of amendment which increased the number of authorized shares was filed with the Secretary of State of Delaware; (4) that Tools had knowledge of an act in Delaware; in addition to making the offer with knowledge of the existence of the pledge agreement and with knowledge that the proposed issuance of shares would diminish IBI's security interest, Tools executed an agreement recognizing that Dutch and Delaware laws would be applicable to the transaction and later entered into a supplemental agreement which contained a representation that Hunter was a Delaware corporation, and that all documents required by the relevant authorities, including Delaware, had been duly filed; and (5) finally, the authorization of 175,000 new shares and the ultimate issuance of 190,000 previously unissued shares in a Delaware corporation through the use of the corporation laws of the State of Delaware, thereby shifting 95% of the control of the corporation to a third party and consequently seriously eroding plaintiff's security interest, is a direct and foreseeable result of the conspiracy.

Moreover, this is not a case where the defendants were unwitting participants in a conspiracy. The stipulation paints a picture of voluntary and knowing participation by Tools in a conspiracy to use the laws of Delaware to achieve the purpose of the conspiracy which resulted in a direct benefit to defendant Tools in the form of an issuance of new shares of Hunter giving Tools a 95% interest.

Furthermore, while we recognize the act of filing the certificate amendment increasing the authorized shares, did not in itself do the damage, it was an essential step to the conspiracy to defraud. Moreover, since Hunter is a Delaware corporation, the essential step had to take place in Delaware and nowhere else. Indeed Delaware is the only jurisdiction necessarily involved in the conspiracy. The public act in Delaware of amending the certificate was therefore a substantial act in the furtherance of the

conspiracy. See *Dauphin Corp. v. Redwall Corp.*, D.Del., 201 F.Supp. 466, 469 (1962).

■ Thus, we hold that the voluntary participation of Tools in the conspiracy, with knowledge of an act to be taken in furtherance of the conspiracy in this jurisdiction, would, in the context of this case, be sufficient contact for the constitutional exercise of jurisdiction under the *International Shoe* standard. Since the jurisdictional statute, 10 *Del.C.* § 365, provides a proper state law method of service, under the stipulated facts, jurisdiction over Tools lies.

Consequently both Tools' motion to dismiss for lack of jurisdiction and Hunter's motion to dismiss for failure to join an indispensable party should have been denied.

## IV

We turn now to Niederer's motion to dismiss. Niederer, unlike Tools, has no proprietary interest in the shares which are the subject of this litigation, and he is not an indispensable party under Court of Chancery Rule 19. Even though, under the same reasoning relating to Tools, Niederer has sufficient contacts with the jurisdiction to meet due process requirements, he still must be properly served in accordance with Delaware law for jurisdiction over him to be asserted. As has been noted previously, IBI attempted to serve Niederer by use of the Delaware director consent statute, 10 *Del.C.* § 3114, and also by Delaware's long arm statute, 10 *Del.C.* § 3104(c)(4).

■ The Delaware director consent statute deems a director of a Delaware corporation to have consented to the appointment of the corporation's registered agent [24] as the defendant director's agent for accepting service of process. Service on a director pursuant to this statute, however, is only contemplated in actions "in which such director, trustee or member is a necessary or proper party, or in any action or proceeding against such director, trustee or member

---

24. If the corporation does not have a registered agent in Delaware, the director is deemed to have appointed the Secretary of State as his agent. 10 *Del.C.* § 3114(a).

for violation of his duty in such capacity, whether or not he continues to serve as such director, trustee or member at the time suit is commenced." The statute does not contemplate consent by a director for acts that were not performed in his capacity as a director. See *Hana Ranch v. Lent*, Del.Ch., 424 A.2d 28, 30–31 (1980). Here, although Niederer was concededly a member of the conspiracy, he did not become a director of Hunter until March 17, 1980,[25] at which point all acts pursuant to, and necessary for completion of the conspiracy had been completed. The only acts which took place after March 17, 1980 were the surrender of the original share certificate which had been received by Tools from Efday, and the issuance of a new share certificate to Tools, "on the authority and with the approval of Niederer . . . ." Appellant does not dispute appellee's contention that board approval was not necessary and that, in fact, no action was taken. Thus, no official action by Niederer was taken in his capacity as a director and, therefore, Niederer was not subject to service pursuant to the director consent statute.

■ Nor was service on Niederer authorized by the Delaware long arm statute. This statement delineates categories of conduct which constitute "legal presence" in the State. 10 *Del.C.* § 3104(b)(c). Such activities include the causation of "tortious injury in the State by an act or omission in this State". § 3104(c)(3). Although the conspiracy had definite effects in the State of Delaware, including a substantial act committed here, it cannot be said to have caused a "tortious injury" here. The injury to the security interest of IBI in 100% of the Hunter stock was caused elsewhere following the increase in Hunter's authorized shares.

Thus, as to Niederer, service cannot be properly effected under either 10 *Del.C.* § 3114 or 10 *Del.C.* § 3104. The Court of Chancery was correct in granting his motion to dismiss.

**25.** Niederer had previously been a director of Hunter from 1977 till his resignation in February 1979, which was before any of the events here in issue transpired.

Insofar as Tools and Hunter are concerned, the judgment of the Court of Chancery dismissing the complaint is reversed and the case is remanded for further proceedings. Insofar as Niederer is concerned, the judgment of the Court of Chancery dismissing the complaint is affirmed.