## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

DENNIS A. REID,                     :
                                    :
      Plaintiff,                    :
                                    :
    v.                            :      **C.A. No. 2874-VCN**
                                    :
VINCENZO DAVIDE SINISCALCHI,        :
GIORGIO CAPRA, ALENIA SPAZIO,       :
ALCATEL ALENIA SPACE ITALIA         :
SpA (f/k/a ALENIA SPAZIO) and       :
FINMECCANICA SpA,                   :
                                    :
      Defendants,                   :
                                    :
      and                           :
                                    :
USRT HOLDINGS, L.L.C. and U.S.      :
RUSSIAN TELECOMMUNICATIONS,         :
L.L.C.,                             :
                                    :
      Nominal Defendants.           :


## MEMORANDUM OPINION


Date Submitted:  June 12, 2014
Date Decided:  November 20, 2014

David W. deBruin, Esquire of The deBruin Firm LLC, Wilmington, Delaware; Derek Y. Brandt, Esquire of Simmons Browder Gianaris Angelides & Barnerd LLC, Alton, Illinois; and Thomas I. Sheridan, III, Esquire, Andrea Bierstein, Esquire, and Paul J. Hanly, Jr., Esquire of Hanly Conroy Bierstein Sheridan Fisher & Hayes, LLP, New York, New York, Attorneys for Plaintiff.

Allen M. Terrell, Esquire, Lisa M. Morris, Esquire, and Rachel E. Horn, Esquire of Richards, Layton & Finger, P.A., Wilmington, Delaware; and Paul J. Vincenti, Esquire, John V. Vincenti, Esquire, and Elyse C. Pillitteri, Esquire of Vincenti & Vincenti, P.C., New York, New York, Attorneys for Defendants Alenia Spazio, Alcatel Alenia Space Italia, S.p.A. and Finmeccanica, S.p.A.

NOBLE, Vice Chancellor

Alenia Spazio, Alcatel Alenia Space Italia, S.p.A., and Finmeccanica, S.p.A (collectively referred to as "the Entity Defendants" or "Finmeccanica"[1]) have moved, pursuant to Court of Chancery Rule 12(b)(2) for lack of personal jurisdiction, and 6 *Del. C.* § 18-1002 for lack of standing, to dismiss Plaintiff Dennis A. Reid's ("Reid" or the "Plaintiff") complaint (the "Complaint"). Plaintiff alleges that the Entity Defendants participated in a conspiracy in which a co-conspirator committed an act in Delaware subject to the long-arm statute. According to Plaintiff, the co-conspirator's actions should be imputed to the Entity Defendants under the conspiracy theory of jurisdiction, establishing a basis for personal jurisdiction in Delaware.

## I. INTRODUCTION

A. *Plaintiff's Substantive Allegations*

On April 9, 2007, Reid filed the Complaint against the Entity Defendants, as well as Vincenzo Davide Siniscalchi ("Siniscalchi") and Giorgio Capra ("Capra"). Reid brought direct claims and derivative ones on behalf of Nominal Defendants U.S. Russian Telecommunications, L.L.C. ("USRT") and USRT Holdings, L.L.C. ("USRT Holdings"), both Delaware limited liability companies. The Complaint includes causes of action for breach of contract, breach of fiduciary duty,

---

[1] Alcatel Alenia Space Italia S.p.A. is an Italian business entity that is the successor to Alenia Spazio. At all times relevant to this action, Alenia Spazio was a division of Finmeccanica, S.p.A. The three are collectively referred to as "Finmeccanica" when doing so helps narrate the facts and issues.

1

conversion, civil conspiracy, tortious interference, and tortious interference with business relations. Reid bases standing for his derivative claims on his 10% interest in USRT Holdings, which wholly owns USRT.

In the Complaint, Reid describes a conspiracy among the Entity Defendants, Siniscalchi, and Capra to breach a joint venture agreement between Finmeccanica and USRT. Reid alleges that the conspirators divested USRT of its share of the joint venture's proceeds, misappropriated its assets, and usurped its corporate opportunities.

B. *Background*[2]

By the 1990s, various Russian satellites were becoming obsolete, but Russia lacked the funds to modernize them. Because of its inability to replace the satellites with new equipment, Russia was at risk of losing commercially valuable geosynchronous orbital slots, which are assigned by an international commission. Dr. Valery Aksamentov ("Aksamentov"), a Russian space scientist living and working in the United States, learned of Russia's situation through his brother and a friend who worked at the Russian Satellite Communications Company

---

[2] This Court has previously described Reid's substantive allegations and this dispute's procedural history. *See Reid v. Siniscalchi*, 2011 WL 378795, at *1-3 (Del. Ch. Jan. 31, 2011); *Reid v. Siniscalchi*, 2008 WL 821535, at *1-4 (Del. Ch. Mar. 27, 2008), *rev'd sub nom. Reid v. Spazio*, 970 A.2d 176 (Del. 2009). The factual summary in this memorandum opinion is based on the current record as developed through jurisdictional discovery. Exhibits submitted by the Entity Defendants attached to the Affidavit of Paul J. Vincenti, Mar. 12, 2014, are cited as "DX_." Exhibits submitted by Reid attached to the Affidavit of Thomas I. Sheridan, III, Apr. 24, 2014, are cited as "SX_."

("RSCC"), the company that allocated and licensed Russian satellite communications frequencies. Sensing a business opportunity, Aksamentov worked with RSCC employees to push for Russian legislation that would allow commercialization of the satellite slots.

Once Russia passed the legislation, Aksamentov developed his plan to secure state-of-the-art technology for new satellites, find Western investors to finance the development and launching of the new satellites, allocate some of the satellite transponders to Russia, and market the rest to commercial customers. Aksamentov envisioned the project's revenues being shared among Russia, the investors, and his group. Along with some colleagues, Aksamentov formed USRT to pursue his plan.[3] Aksamentov's personal connections allowed USRT to develop strong relationships with RSCC and other Russian entities.

The satellite project drew early interest from the Italian government, and representatives of USRT met with Italian delegates in October 1997. Italy informally appointed Capra, an Italian Navy officer, advisor to the Italian Ministry of Defense, and board member of the Italian Space Agency, to serve as a liaison between USRT and Italy.

---

[3] This plan, and later iterations in which USRT alleges it had a right to participate, are referred to as the "satellite project."

3

On November 26, 1997, Capra informed Aksamentov and RSCC that Italy was "committed to the joint venture with USRT."[4] On December 5, Italy reconfirmed its "firm and full commitment . . . to provide full financing as a joint-venture partner of USRT . . . ."[5] A month later, Italy brought Finmeccanica, an Italian state-controlled entity, into the project to obtain financing.[6] Due to his role as a government representative, Capra "had a lot of relations" with Finmeccanica's management.[7] Capra introduced USRT to Finmeccanica on December 11, 1997, and later that month, Finmeccanica agreed to be USRT's joint venture partner for the satellite project.

USRT and Finmeccanica scheduled a meeting with the Russians for January 12, 1998. Before the meeting, USRT told Finmeccanica that the parties must prepare "all documentation required to reconfirm our commitment to the joint program."[8] On December 31, 1997, Capra sent Finmeccanica a draft letter with an attached note explaining, "the words have been carefully chosen, with a view to avoiding an effective commitment."[9] Days later, Finmeccanica sent USRT a letter acknowledging, "consequent to our meeting on December 18, 1997, and pursuant

---

[4] SX47.

[5] DX15.

[6] At all times relevant to the Complaint, Finmeccanica was 61% owned by an Italian company that was wholly owned by the Italian Treasury Ministry.

[7] DX86 (Giuseppe Viriglio Dep., Sept. 11, 2002) at 192.

[8] DX36.

[9] SX10 (translated at Capra Dep., Dec. 12, 2013 (Capra Dep.) 54).

to your letter dated December 26, 1997, we hereby confirm our attendance at the meetings in Moscow scheduled for January 12, 1998, as your joint venture partner."[10]

Despite Finmeccanica's written confirmation of the joint venture, Aksamentov informed Capra that USRT and Finmeccanica needed to execute a formal joint venture agreement before meeting with the Russians.[11] Capra forwarded Aksamentov's letter to Finmeccanica and expressed his belief that it was necessary to satisfy USRT's requests at that time.

Subsequently, on January 12, 1998, USRT and Finmeccanica signed their first of several memoranda of agreement ("MOA"). The parties agreed to "jointly elaborate a business plan of the [satellite project]" and to "negotiate in good faith."[12] The agreement identified USRT as "a company incorporated under the laws of Delaware." Before the MOA was signed, Finmeccanica had questioned Aksamentov as to why USRT was necessary to the satellite project. Finmeccanica also expressed interest in dealing with the Russians directly. However, Aksamentov convinced Finmeccanica that USRT's relationship with RSCC, the Russian entity in control of the orbital slots, was very valuable. USRT had already

---

[10] DX23.
[11] SX41.
[12] DX24 ¶¶ 3, 5.

5

entered into a joint venture arrangement with RSCC and RSCC wanted to work with USRT.[13]

Once the MOA was signed, Finmeccanica and USRT attended meetings in Moscow. After these meetings, on January 19, 1998, Siniscalchi forwarded questions from the Italian government to USRT. The questions sought information regarding USRT's structure, business, and relationship to the Russian government. The final question was: "What is the commercial value of what USRT brings to the joint venture?"[14] USRT responded to these questions by sending information about the satellite project to Capra, and that information was subsequently used to prepare a financing submission to the Italian government.

On January 23, Finmeccanica sent USRT a letter indicating its understanding that although it was "more than willing to become USRT [sic] partner in [the satellite business]," a joint venture would not actually be formed until several conditions precedent were met.[15] This sentiment appeared to hedge against Finmeccanica's earlier acknowledgements that it and USRT were already joint venture partners.

On January 25, Capra wrote to Finmeccanica, exclaiming, "I'm convinced that any unilateral action by [Finmeccanica] not agreed upon with the Russians and

---

[13] SX2 (Aksamentov Aff., Nov. 9, 2007 (Aksamentov 2007 Aff.)) ¶¶ 13-14.
[14] DX52.
[15] DX82.

6

the Americans might seriously harm the program and presumably cancel it!"[16] Within a week of Capra's warning, Finmeccanica's representatives met unilaterally with the Russians to discuss the satellite business.[17] This meeting occurred while other representatives of Finmeccanica met with USRT's representatives in Texas to sign a revised MOA, reconfirming their commitment to the joint venture. The new MOA acknowledged "that USRT may be reorganized as a new Delaware entity based on further discussions."[18]

Throughout early 1998, Finmeccanica continued communicating unilaterally with the Russian entities to which USRT had introduced it. Finmeccanica sought to "develop a long term cooperation program" with the Russians with "the first short term opportunity of such nature . . . represented by the . . . Gorizont Satellite Replacement Program."[19] The Gorizont Program was the satellite project in which USRT had an interest.[20]

During the spring of 1998, RSCC transferred control of the Russian satellite slots to another Russian company, InSpace. On April 1, InSpace invited USRT, through Aksamentov, along with its "industrial partner [Finmeccanica]," to Russia

---

[16] SX23 (translated at Capra Dep. 80).
[17] SX26. Reid and Finmeccanica offer conflicting interpretations of this meeting's scope. The meeting's program states the agenda in very general terms. Apparently, Finmeccanica gave a presentation regarding its business, and opinions were exchanged on the use of satellite navigation systems.
[18] DX25 ¶ 6.
[19] SX17.
[20] *See* DX 27 ¶ 1.

in order to discuss the satellite project.[21]  On April 6, USRT and InSpace entered into a nondisclosure agreement, which provided, "Each party agrees that it will not circumvent the other party and attempt to do, or actually do, business with the contacts and sources of the other party unless otherwise agreed in writing by the parties."[22]

On April 7, Finmeccanica suggested that it might deal directly with InSpace.[23]  However, Aksamentov informed it of the non-circumvent provision in USRT and InSpace's agreement.  The next day, Finmeccanica, USRT, and InSpace, formed a joint venture to exploit the satellite slots.  InSpace was to receive forty percent of the project's revenues, with Finmeccanica and USRT splitting the rest.

After this three-way agreement was signed, USRT informed Finmeccanica that until the two executed a new bilateral MOA, "all meetings with the appropriate Russian parties [would] be indefinitely postponed."[24]  Capra reiterated to Finmeccanica that without a new MOA, "the Moscow meetings planned for May 11 to 16 might be jeopardized."[25]  In response, the parties signed a new MOA on May 12, 1998, providing in part that "any action towards third parties shall be

---

[21] SX21.
[22] SX33 ¶ 2.
[23] Aksamentov 2007 Aff. ¶ 25.
[24] SX35.
[25] DX46.

previously agreed upon between the parties and neither [party] shall undertake any action which could adversely affect the implementation of their joint business."[26] This MOA remained in effect until Finmeccanica eventually canceled it on December 20, 1999.[27]

Throughout the summer and fall of 1998, Finmeccanica was unable to obtain the financing required for the satellite project, and late that year, Capra and Siniscalchi supposedly told USRT that the Italian government would only approve the deal if USRT were entirely Italian-owned. On August 30, 1998, Siniscalchi informed USRT that "there is going to be no deal . . . unless control of USRT is also fully transferred."[28]

Then, on September 13, Siniscalchi wrote to Aksamentov informing him that "[e]ffective immediately . . . Capra and . . . Siniscalchi withdraw and cancel any proposal to purchase 100% of USRT."[29] However, days later, Capra wrote to USRT's lawyer regarding the "[a]cquisition of 100% of the membership interests in USRT."[30]

---

[26] DX27 ¶ 6. This MOA superseded all previous written agreements between the parties. It "set forth the principles of agreement between [Finmeccanica and USRT] for the [initial stage of the satellite project], in particular for what concerns the structure of the joint venture for its implementation . . . ." *Id.* ¶ 2. The parties agreed "to pursue jointly the [satellite project]," and to negotiate the terms of a final agreement in good faith. *Id.* ¶¶ 5-6.

[27] DX79.

[28] SX49.

[29] SX50.

[30] SX56.

At Capra's request, Siniscalchi formed USRT Holdings in Delaware on October 6, 1998, with Capra initially the company's sole member. USRT Holdings purchased all membership interests in USRT (the "Acquisition") in exchange for $300 million in revenue participation rights that would have been valuable if USRT had been able to consummate the joint venture project. At USRT, Capra became the chief executive officer, Siniscalchi the chief operating officer, Jon L. Reed ("Reed") the president, and Reid the chief financial officer. The day after USRT Holdings's formation in Delaware, Capra granted Reed and Reid each the right, valid for five years, to demand five percent membership interests in USRT Holdings.[31] After the Acquisition, Siniscalchi sent both USRT's and USRT Holdings's business records to Capra in Italy.[32]

Within days of the Acquisition, USRT's lawyer sent Finmeccanica a letter voicing a concern that an upcoming meeting between Finmeccanica and the Russians that excluded USRT violated the May 12 MOA.[33] Finmeccanica dismissed USRT's concerns and confirmed its intention to meet unilaterally with the Russians.[34] Within weeks, the law firm that had sent the letter to Finmeccanica no longer represented USRT.

---

[31] Reid exercised his right on June 2, 1999. Reed exercised his right as well, and at some point transferred his interest to Reid.

[32] Siniscalchi Dep., Aug. 22, 2013 (Siniscalchi 2013 Dep.) 263-65.

[33] SX9.

[34] SX15.

On November 19, 1998, Finmeccanica applied for financing from the Italian government for its three-way joint venture with USRT and InSpace. The application did not mention that USRT was owned by Capra. Three months later, the Italian Ministry of Industry, Commerce and Handicraft issued a written response, noting that the project did not qualify for funding under the law that Finmeccanica had invoked in its application. Further, the law that could have provided financing was not yet enacted. However, the government viewed the satellite project as a "significant program" and did not rule out the possibility that funds would be available in the foreseeable future.[35]

Despite the failure to receive the desired financing, Finmeccanica continued communicating with the Russians regarding the satellite business. On April 29, 1999, Italy adopted legislation that allowed for the funding of aerospace projects including the satellite project.[36] Within days, Reed wrote to Finmeccanica, expressing USRT's desire to "constructively . . . work with [Finmeccanica] in preparing formal Joint Venture documents as well as planning technical meetings with Russian counterparts . . . ."[37] Finmeccanica was meanwhile meeting unilaterally with the Russians and informing them, "The Italian Government has adopted the law giving [Finmeccanica] the opportunity to cooperate with Russian

---

[35] DX65.
[36] DX5 (Reed Aff. Oct. 18, 2002) ¶ 11.
[37] DX76.

11

companies on space projects and providing financial support for [Finmeccanica]."[38]

In May 1999, Finmeccanica allegedly attempted to bribe Reid and Reed to accept payments in return for Finmeccanica's exploitation of USRT's interests in the satellite project. Neither Reid nor Reed accepted Finmeccanica's offered compensation and both told Siniscalchi that, now that Italian funding was available, USRT should take a firm stand regarding its rights. Both Reid and Reed were fired from their positions in August 1999.

On October 11, 1999, Reid sent Finmeccanica's CEO a letter in which he held himself out as "represent[ing] the Minority Interest in USRT Holdings, L.L.C. the sole owner of [USRT]" and alleged that Finmeccanica was attempting to "divest USRT of its satellite interests."[39] Then, on December 20, Finmeccanica terminated the May 12 MOA. Approximately a week later, Siniscalchi wrote to Reid: "Consequent to a letter from . . . and upon [Finmeccanica's] request, I hereby order you to cease and desist from representing yourself or taking actions and being in any way whatsoever associated with [USRT]."[40]

Sometime late in 1999, a Russian company launched a satellite allegedly financed by Finmeccanica. Reid contends that the Entity Defendants are carrying

[38] SX20.
[39] DX71.
[40] SX27.

out USRT's business plan without its participation, and that more satellites have been or are planned to be launched. Reid alleges that USRT Holdings and USRT are suffering irreparable injury as a result of the Entity Defendants' actions.

## C. *Current Procedural Posture*

The Entity Defendants first moved to dismiss the Complaint, based on the statute of limitations and laches, as well as lack of personal jurisdiction, on June 29, 2007. The Court's dismissal of the action on the basis of the applicable statute of limitations and laches[41] was subsequently reversed by the Supreme Court.[42] Because the Court had dismissed the Complaint on alternate grounds, the Court had not addressed the issue of personal jurisdiction.[43]

On remand, the Court refrained from deciding the personal jurisdiction question until Plaintiff was afforded the opportunity to undertake jurisdictional discovery in Delaware.[44] While Plaintiff had previously taken jurisdictional discovery in Texas, the Court recognized that the focus of discovery to establish this Court's jurisdiction over the Entity Defendants could be different. Since

---

[41] *Reid*, 2008 WL 821535, at *12.
[42] *Reid v. Spazio*, 970 A.2d 176, 178 (Del. 2009).
[43] *Reid*, 2008 WL 821535, at *12 n.85.
[44] Transaction ID 24798161 (Letter to Counsel, dated Apr. 21, 2009).

13

discovery, the Entity Defendants moved to dismiss the Complaint for lack of personal jurisdiction and for lack of standing.[45]

## II. PERSONAL JURISDICTION

A. *Legal Standard for Motion to Dismiss for Lack of Personal Jurisdiction*

When a defendant moves to dismiss under Court of Chancery Rule 12(b)(2), the plaintiff must establish a basis for the Court's exercise of personal jurisdiction.[46] The Court may consider "pleadings, affidavits, and any discovery of record,"[47] and "draw[s] reasonable inferences in favor of the plaintiff."[48] After jurisdictional discovery, "plaintiff must allege specific facts supporting its position."[49] A plaintiff must (i) identify a statutory basis for jurisdiction under Delaware's long-arm statute, 10 *Del. C.* § 3104(c), and (ii) demonstrate that subjecting the defendant to jurisdiction would comport with the Due Process Clause of the Fourteenth Amendment.[50]

Delaware's long-arm statute provides jurisdiction over a defendant who "in person or through an agent . . . [t]ransacts any business or performs any character

---

[45] The Entity Defendants added lack of standing as a basis to dismiss the Complaint after obtaining evidence through discovery subsequent to the submission of their original motion to dismiss.

[46] *Hart Holding Co. Inc. v. Drexel Burnham Lambert Inc.*, 593 A.2d 535, 538-39 (Del. Ch. 1991).

[47] *Sprint Nextel Corp. v. iPCS, Inc.*, 2008 WL 2737409, at *5 (Del. Ch. July 14, 2008).

[48] *Vichi v. Koninklijke Philips Elecs. N.V.*, 2009 WL 4345724, at *4 (Del. Ch. Dec. 1, 2009) (citing *Sample v. Morgan*, 935 A.2d 1046, 1056 (Del. Ch. 2007)).

[49] *Sprint Nextel Corp.*, 2008 WL 2737409, at *5 (citing *Medi-Tec of Egypt Corp. v. Bausch & Lomb Surgical*, 2004 WL 415251, at *2 (Del. Ch. Mar. 4, 2004)).

[50] *Id.*

of work or service in the State . . . [or c]auses tortious injury in the State by an act or omission in this State."[51] According to the conspiracy theory of personal jurisdiction, a conspirator's co-conspirators are treated as his agents. Therefore, "any act by a conspirator in furtherance of the conspiracy which takes place in the jurisdiction is attributable to the other conspirators."[52] If one co-conspirator's actions in advancing the conspiracy subject him to long-arm jurisdiction, then all other conspirators are also subject to personal jurisdiction.[53]

The conspiracy theory is thus not an independent jurisdictional basis, but a way to impute a conspirator's conduct to a co-conspirator not otherwise subject to the Court's jurisdiction.[54] The Court employs a "narrowly and strictly construed" five-part test to determine whether a conspiracy supports personal jurisdiction.[55] A plaintiff must present factual proof of each of five elements:

> (1) a conspiracy to defraud existed; (2) the defendant was a member of that conspiracy; (3) a substantial act or substantial effect in furtherance of the conspiracy occurred in the forum state; (4) the defendant knew or had reason to know of the act in the forum state or that acts outside the forum state would have an effect in the forum state; and (5) the act in, or effect on, the forum state was a direct and foreseeable result of the conduct in furtherance of the conspiracy.[56]

---

[51] 10 *Del. C.* § 3104(c)(1), (c)(3).

[52] *Istituto Bancario Italiano SpA v. Hunter Eng'g Co.*, 449 A.2d 210, 222 (Del. 1982).

[53] *Id.*

[54] *Benihana of Tokyo, Inc. v. Benihana, Inc.*, 2005 WL 583828, at *6 n.16 (Del. Ch. Feb. 4, 2005).

[55] *Computer People, Inc. v. Best Int'l Gp., Inc.*, 1999 WL 288119, at *6 (Del. Ch. Apr. 27, 1999).

[56] *Carlton Invs. v. TLC Beatrice Int'l Hldgs.*, 1995 WL 694397, at *12 (Del. Ch. Nov. 21, 1995) (citing *Istituto Bancario*'s five-part test).

B. *Reid's Jurisdictional Argument*

The act in Delaware on which Reid bases his argument for personal jurisdiction is the formation of USRT Holdings.[57] Siniscalchi is subject to the long-arm statute due to his formation of USRT Holdings in Delaware as Capra's agent. Capra is also subject to long-arm jurisdiction under the theory that Siniscalchi acted as his agent. In order to impute the Delaware act to the Entity Defendants, Reid must present specific factual evidence supporting all five *Istituto Bancario* factors. The Court "analyze[s] the elements of the five-part conspiracy theory test using the deferential factual standard of a motion to dismiss, as limited by the more exacting factual requirements of the conspiracy theory."[58]

1. First and Second *Istituto Bancario* Factors

The first two *Istituto Bancario* factors require Reid to offer evidence that Finmeccanica was a member of a conspiracy to defraud. While he lacks direct proof of a conspiracy, "[c]onspiracy is a crime long recognized as dependent on circumstantial evidence for proof that it occurred."[59] There is some tension

---

[57] Reid also argues that 10 *Del. C.* § 3104(c)(3) subjects the Entity Defendants to personal jurisdiction because the injury to USRT was a substantial effect in Delaware by virtue of USRT's status as a Delaware limited liability company. The Court need not, and thus does not, consider the merits of this contention.

[58] *Vichi*, 2009 WL 4345724, at *6; *see also id.* at *6 n.42 ("The fact that [plaintiff] has had the benefit of jurisdictional discovery also requires me to use a more exacting factual standard."). Not only has Reid taken jurisdictional discovery in Delaware, but he took discovery in the previous Texas actions as well.

[59] *Lemons v. State*, 32 A.3d 358, 362 (Del. 2011).

16

between requiring Reid to allege specific facts to support jurisdiction and recognizing that a plaintiff often cannot produce direct evidence of a conspiracy. Reid must offer specific facts from which one can reasonably infer that a conspiracy existed.

To prove the existence of a civil conspiracy, Reid must establish the following elements: "(1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds between or among such persons relating to the object or a course of action; (4) one or more unlawful acts; and (5) damages as a proximate result thereof."[60]

### (a) *Two or More Persons*

Reid's allegation that Finmeccanica, Capra, and Siniscalchi participated in a conspiracy satisfies the first element of a civil conspiracy. Whether or not Reid has produced evidence of a meeting of the minds among these individuals is a close question, discussed *infra.*

### (b) *Object to be Accomplished*

Reid alleges that the conspiracy's goal was for Finmeccanica to breach its joint venture agreement with USRT and misappropriate value from the satellite project. Presumably, Finmeccanica partnered with USRT in part to exploit its

---

[60] Donald J. Wolfe, Jr. & Michael A. Pittenger ("Wolfe & Pittenger"), *Corporate and Commercial Practice in the Delaware Court of Chancery*, § 3.04[b], at 3-85 (2014) (citing *Zirn v. VLI Corp.*, 1989 WL 79963, at *9 (Del. Ch. July 17, 1989)).

Russian contacts. Once introduced to the Russians, Finmeccanica was allegedly incentivized to avoid its commitments to USRT.

(i) Finmeccanica's Incentive to Breach its Agreements with USRT

The May 12, 1998, MOA between Finmeccanica and USRT was effective until December 20, 1999. Finmeccanica argues that the MOA was not a final agreement between the parties and did not impose heavy obligations. Since several conditions precedent were never met, Finmeccanica claims that the MOA was never binding, and therefore, there was no reason to conspire to breach the agreement. However, the MOA provided that its terms were to be regulated by final agreements that would be negotiated in good faith.[61] The parties agreed "to pursue jointly the [satellite project]" and agreed that "action towards third parties shall be previously agreed upon between the parties and neither of them shall undertake any action which could adversely affect the implementation of their joint business."[62]

The MOA supports a finding that USRT and Finmeccanica were joint venturers with the concomitant duties of "utmost good faith, fairness and honesty with respect to their relationship to each other and to the [satellite project]."[63]

---

[61] DX27 ¶ 5.

[62] *Id.* ¶ 6.

[63] *In re Arthur Treacher's Fish & Chips of Ft. Lauderdale, Inc.*, 386 A.2d 1162, 1166 (Del. Ch. 1978).

18

Reid's allegation that Finmeccanica breached those duties provides the legal foundation for most of his claims. Until its termination, the MOA governed various rights and obligations between the parties.

Presumably, Finmeccanica saw value in maintaining its relationship with USRT; otherwise, it could have canceled the MOA well before it did. However, Finmeccanica also had an incentive to proceed with the satellite project without USRT. According to the three-way MOA with InSpace, Finmeccanica and USRT were to split 60% of the joint venture's profits. The satellite project was forecast to earn hundreds of millions of dollars and Finmeccanica could have doubled its profits by excluding USRT.

(ii) <u>Finmeccanica's Supposed Reluctance to Commit to USRT</u>

In addition to establishing motive, Reid cites evidence of a pattern of behavior suggesting that Finmeccanica was reluctant to partner formally with USRT and frequently attempted to avoid its commitments. This behavior allegedly supports the theory that Finmeccanica acted in pursuit of an illegitimate goal. At times, Finmeccanica questioned why USRT was necessary to the satellite project and expressed its desire to deal with the Russians directly. Further, Finmeccanica's signing of the MOAs often coincided with upcoming meetings among it, USRT, and the Russians. Reid argues that Finmeccanica tried to back off of its commitments after being introduced to the Russians and obtaining

19

USRT's valuable information.[64]  One can infer that Finmeccanica signed the MOAs to appease USRT and to access its Russian connections.  Finmeccanica dealt unilaterally with the Russians after the initial meetings with USRT.  Capra allegedly coached Finmeccanica on how to string USRT along while trying to avoid effective commitments.[65]

Finmeccanica objects to the notion that it sought to avoid its obligations to USRT and argues that Reid assigns nefarious meaning to innocent business communications.  Most sophisticated business entities would ask questions before pursuing a deal the magnitude of the satellite project.  Finmeccanica claims to have actively pursued the joint venture project with USRT, both before and after the Acquisition.  Finmeccanica allegedly made its best efforts to obtain funding from the Italian government.  Its November 19, 1998, financing application, submitted after the Acquisition, referenced USRT as its joint venture partner.[66]  USRT helped prepare that application and Finmeccanica contends that this evidence shows its continued commitment to the joint venture, contrary to Reid's assertion that Finmeccanica openly breached their agreement after the Acquisition.

---

[64] *See supra* text accompanying n.15.  Reid argues that Finmeccanica's January 23, 1998, letter to USRT improperly suggested that although a joint venture was a goal, one had not yet been formed.  Allegedly, the letter also added conditions to Finmeccanica's commitments.

[65] *See, e.g.*, SX10.  This letter from Capra to Finmeccanica, discussed *supra* text accompanying n.9, included Capra's draft of a letter that Finmeccanica could use to prepare a letter to USRT whereby Finmeccanica confirmed its participation in the joint venture while "avoiding an effective commitment."

[66] DX63.

While Finmeccanica's arguments are logical, they do not preclude accepting Reid's theory that Finmeccanica desired excluding USRT from the satellite project. Finmeccanica could have believed it prudent to string USRT along, even after the Acquisition. For example, including USRT on its financing application may have improved its chances of securing funding, and once funding was obtained, USRT could be excluded from the project. The Court cannot weigh the evidence at this stage and must take permissible inferences in Reid's favor.

(c) *Meeting of the Minds*

One can infer the existence of a close and ongoing relationship between Capra and Finmeccanica. Capra was appointed by the Italian government to represent its interests in the satellite project and Italy was financially invested in Finmeccanica.[67] He was familiar with Finmeccanica's management before the satellite project was ever considered. There is evidence that Capra frequently communicated with Finmeccanica and advised it on how best to interact with

---

[67] Finmeccanica argues that the fact that Capra held a position with Finmeccanica's "parent," does not serve as evidence of a conspiracy with a subsidiary or affiliate of the parent. *See Hospitalists of Del., LLC v. Lutz*, 2012 WL 3679219, at *11 (Del. Ch. Aug. 28, 2012). While a parent entity will not be found to "have conspired with and aided and abetted its subsidiary [by virtue of] merely presid[ing] atop the corporate structure while wrongdoing ensued," a parent may be found to be a conspirator when a plaintiff "identif[ies] specific behavior from which a court can infer knowing participation or conspiratorial agreement." *Id.* Reid does not allege that Italy, as Finmeccanica's "parent," was involved in the conspiracy. Further, he does not rely only on Capra's position with the Italian government to prove that he conspired with Finmeccanica. Rather, Reid infers Capra's participation in the conspiracy from his communications and actions.

21

USRT to achieve its goals.[68] He was allegedly privy to Finmeccanica's plans, as evidenced by his warning against unilateral action shortly before Finmeccanica met with the Russians without USRT. Capra also frequently forwarded correspondence from USRT to Finmeccanica. One can infer that Capra ordered Siniscalchi to form USRT Holdings and completed the Acquisition for the benefit of Finmeccanica.

Finmeccanica argues that Reid's characterization of Capra's relationship with Finmeccanica is misleading. Capra also often communicated with and advised USRT. As Italy's representative, not initially on either USRT's or Finmeccanica's side, he served as an intermediary to facilitate a deal.

One might also conclude that Capra's interests evolved to become closely aligned with USRT's as a result of the Acquisition. He could have earned millions of dollars if USRT participated in the satellite project.

Finmeccanica's arguments are legitimate; however, the Court cannot yet weigh the evidence or decide between conflicting theories of Capra's motivations. There is evidence from which one can infer the existence of a close relationship between Capra and Finmeccanica extending beyond Capra's role as a liaison. One can also conclude that Capra was sympathetic to Finmeccanica's interests.

---

[68] *See, e.g.,* SX23 (Capra's warning against "unilateral action"); SX10 (Capra's draft of a letter to be sent to USRT "with a view to avoiding an effective commitment"); DX46 (Capra's advice to Finmeccanica that a new MOA should be signed to avoid cancellation of upcoming meetings in Russia).

There is other evidence that potentially implicates Siniscalchi in the alleged conspiracy. Siniscalchi frequently communicated with Capra, and due to his line of work, Siniscalchi often curried favor with Italian officials. Siniscalchi and Capra allegedly manipulated USRT's members to transfer control of the company.[69] They also appear to have jointly prepared the proposal for the Acquisition.[70] Siniscalchi represented USRT Holdings in its purchase of USRT and failed to protect USRT's rights after the Acquisition. Siniscalchi formed USRT Holdings on Capra's behalf and sent USRT Holdings's business records to Capra in Italy.

Finmeccanica protests that Capra and Siniscalchi were never employees, agents, consultants, or representatives of Finmeccanica. There is no evidence that either was compensated by Finmeccanica; rather, their financial incentives were apparently aligned with USRT's. While Reid fails to establish that Capra or Siniscalchi were compensated for their roles in the alleged conspiracy, he does raise the possibility that Capra's and Siniscalchi's interests were aligned with

---

[69] *See, e.g.,* DX12 (letter from Siniscalchi to USRT mentioning that although USRT's project was still alive, it was no longer a priority for Siniscalchi); DX17 (letter from Capra to USRT indicating that there had been some progress in the Italian Senate regarding financing). Reid cites these communications, among others, as evidence that Siniscalchi and Capra purposefully framed the satellite project's status in ways that they hoped would lead USRT's members to believe that selling their interests might be the final necessary step to obtain financing.

[70] *See* SX50 (Siniscalchi's letter to Aksamentov, discussed *supra* text accompanying n.29, withdrawing his and Capra's proposal to purchase USRT's equity).

Finmeccanica's.[71]  Capra allegedly enjoyed a long-standing relationship with Finmeccanica, and as a career-military man and Italian public servant, supposedly possessed natural sympathies toward Italian industry.  Siniscalchi, who was well-connected with Italian officials, allegedly maintained a close and mutually beneficial relationship with Capra.  Therefore, both were potentially motivated o act for Finmeccanica's benefit.

Further, Finmeccanica's alleged change in behavior following the Acquisition supports a finding of a meeting of the minds among Capra, Siniscalchi, and Finmeccanica.  The idea for the Acquisition supposedly came from Capra's "side."[72]  One might conclude that Capra's "side" included Finmeccanica.  Allegedly, after the Acquisition, Finmeccanica stopped dragging its feet, obtained funding, and pursued a satellite project with the Russians.  Finmeccanica applied for financing from the Italian government on November 19, 1998, despite having been able to do so since May, when Finmeccanica, USRT, and InSpace signed their three-way MOA.  However, Finmeccanica did not apply until Capra controlled USRT.

---

[71] Finmeccanica notes that over the period of several years, Siniscalchi assisted USRT in its efforts to consummate the satellite project, at times providing advice contrary to Finmeccanica's interests.  He appears to have lobbied for USRT's interests both before and after USRT Holdings's formation.  The Court agrees that the evidence for Siniscalchi's involvement in a potential conspiracy is weak.  However, as discussed, one can infer that Siniscalchi and Capra together orchestrated the Acquisition, which was vital to the conspiracy.

[72] Siniscalchi 2013 Dep. 108.

After the Acquisition, Finmeccanica eventually pursued the satellite business unilaterally with the Russians. Reid complained about USRT's exclusion from the satellite project, but apparently could not protect its rights since Capra controlled USRT Holdings. Further, Finmeccanica allegedly became bolder by openly meeting with the Russians unilaterally and allegedly causing the termination of USRT's lawyers for attempting to assert USRT's rights. If one accepts Reid's contention that Finmeccanica's behavior changed following the Acquisition, one can infer that Finmeccanica recognized that event as important in allowing it to disregard USRT's rights. Capra's control of USRT was apparently beneficial to Finmeccanica's interests and one can conclude that Capra completed the Acquisition on its behalf.

(d) *Unlawful Act*

The formation of USRT Holdings was allegedly an integral step in the conspiracy. USRT Holdings was needed to complete the Acquisition, which supposedly rendered USRT incapable of enforcing its rights while keeping the May 12 MOA in effect. As already discussed, Finmeccanica may have had reasons to keep the MOA alive; however, Capra's control of USRT apparently assured Finmeccanica that it would not need to share the satellite project's revenues with USRT.

(e) *Damages*

USRT purportedly suffered damages due to its exclusion from the satellite project. On October 9, 1999, Finmeccanica entered into a memorandum of understanding with Gascom, a Russian company, through which Finmeccanica agreed to finance the construction and launch of four replacement satellites.[73] Such action may have breached Finmeccanica and USRT's May 12 MOA, which prohibited unilateral action towards third parties, but neither Capra nor Siniscalchi protected USRT's rights.

Reid alleges that the Italian government allocated over $700 million for the satellite project in early 1999 and Finmeccanica ultimately received $2 billion by 2000.[74] Finmeccanica counters that the Italian government never provided sufficient financing for the satellite project.[75] Finmeccanica also argues that USRT never secured rights to the satellite slots identified in the MOA, which was a condition precedent to that project. The Russian government transferred the satellites slots to Gascom and, according to Finmeccanica, USRT could not have secured the rights to those slots.

---

[73] SX40.

[74] SX4 ¶¶ 12-13.

[75] *See* DX65 (February 17, 1999, letter from the Italian Government regarding Finmeccanica's request for financing).

Finmeccanica also asserts that the scope of its participation in the project with Gascom was very limited.[76] Supposedly, Finmeccanica merely manufactured and sold satellite parts to Gascom as a subcontractor, and the satellite project, as contemplated by the MOA with USRT, never went forward.

The parties thus dispute the nature of Finmeccanica's eventual projects with the Russians. Now is not the time to decide that issue. However, Finmeccanica and USRT were bound by a MOA obligating them to negotiate in good faith in their joint pursuit of the satellite project. While the parties never reached a final agreement, Finmeccanica was not at liberty to circumvent its commitments. Although Reid has far from proved that Finmeccanica breached its agreements with USRT and misappropriated revenues, he has presented facts from which one could infer that Finmeccanica acted in its interests to exclude USRT from the benefits of their joint venture.

### 2. The Final Three *Istituto Bancario* Factors

The third *Istituto Bancario* factor, requiring a substantial act or effect in Delaware in furtherance of the conspiracy, is easily satisfied. The filing of a corporate instrument in Delaware is an act occurring in the State.[77] When done as

---

[76] DX14 at 5 ("[T]he only obligation that [Finmeccanica] has to [Gascom] under their contract is to provide the parts of satellites . . . .").
[77] *See Matthew v. Fläkt Woods Gp. SA*, 56 A.3d 1023, 1027-28 (Del. 2012).

an integral part of a wrongful scheme, the formation of a Delaware entity confers personal jurisdiction under the long-arm statute.[78]

There is evidence that the formation of USRT Holdings in Delaware was a vital step in the alleged conspiracy. USRT Holdings was allegedly formed for the sole purpose of acquiring all of the membership interests in USRT. Once USRT was under Capra's control, the conspirators prevented it from enforcing its rights, allowing Finmeccanica to misappropriate the opportunity contemplated by the joint venture.[79]

The fourth *Istituto Bancario* factor is satisfied because one can infer that Finmeccanica knew or had reason to know of USRT Holdings's formation in Delaware. Reid need not offer direct evidence of Finmeccanica's knowledge that USRT Holdings was formed as a Delaware entity. Instead, Reid may offer facts supporting that inference.[80]

As discussed *supra*, one can infer a close relationship between Capra and Finmeccanica that involved keeping each other informed of their plans. Capra supposedly ordered USRT Holdings's formation on Finmeccanica's behalf. The

---

[78] *Conn. Gen. Life. Ins. Co. v. Pinkas*, 2011 WL 5222796, at *2 (Del. Ch. Oct. 28, 2011).

[79] Siniscalchi, not Capra, was directly responsible for filing USRT Holdings's Certificate of Formation in Delaware. As previously discussed, the record supports an inference that Siniscalchi was a conspirator. However, even if Siniscalchi were not a conspirator, his act would be imputed to Capra based on his formation of USRT Holdings as Capra's agent.

[80] *Fläkt Woods*, 56 A.3d at 1028.

idea for forming the new Delaware entity came from Capra's "side," which allegedly included Finmeccanica. If a conspiracy unfolded in the manner in which Reid alleges, Finmeccanica was likely aware of the basic structure of the entity formed specifically to accomplish its conspiratorial goal. Finmeccanica had formed Delaware subsidiaries in the past, and if Capra acted at its direction, it is reasonable to believe that Finmeccanica would have instructed him to form USRT Holdings in the State.

Further, the various MOAs between USRT and Finmeccanica referred to USRT as a Delaware entity and even acknowledged that USRT might be reorganized as a new Delaware entity, which eventually occurred with the formation of USRT Holdings. Finmeccanica's applications for financing also described USRT as a Delaware entity. The facts support the inference that Finmeccanica knew that USRT Holdings was formed in Delaware. At the very least, Finmeccanica "should have known" of USRT Holdings's Delaware nexus.[81]

---

[81] *Id.* at 1029. Since USRT Holdings's formation was allegedly essential to the conspiracy, Finmeccanica should have assured itself of the proper formation of USRT Holdings as a matter of "[s]imple prudence." Finmeccanica argues that USRT's members kept USRT Holdings a secret because the transfer of USRT's equity violated the Foreign Corrupt Practices Act, 15 USC § 78dd-1 *et seq.* and would have been viewed by the Italian Government as a conflict of interest and self-dealing. According to Finmeccanica, USRT's members believed that to obtain financing, it would be beneficial if USRT were owned by an Italian citizen. USRT's members supposedly thought that Capra's involvement with USRT would influence the Italian government's decision to provide funding. Allegedly, USRT's members kept USRT Holdings's formation secret from Finmeccanica because of the illegal nature of their plan. This is a possible

Also, by October 1999, Finmeccanica was aware of the formation of USRT Holdings and the transfer of interests in USRT. On October 11, Reid sent Finmeccanica's CEO a letter in which he described himself as "represent[ing] the Minority Interest in USRT Holdings, L.L.C. the sole owner of [USRT]" and alleged that Finmeccanica was attempting to "divest USRT of its satellite interests."[82] Reid's letter included a chart describing the ownership structures of USRT and USRT Holdings. At this time, the alleged conspiracy was ongoing.

The October 11 letter does not reference USRT Holdings's status as a Delaware entity. However, Reid's letter complains of the alleged divestiture of USRT's rights in the satellite project. Given the circumstances, "one would expect someone at [Finmeccanica] to have inquired into the matter promptly in order to avoid becoming embroiled in litigation."[83] Since the alleged conspiracy continued beyond October 11, 1999, Finmeccanica's knowledge, or the fact that it should have had knowledge, as of that date satisfies *Istituto Bancario*'s fourth requirement.[84]

___

explanation for why USRT Holdings was formed. Again, however, the Court must make reasonable inferences in Reid's favor.
[82] DX71.
[83] *Fläkt Woods*, 56 A.3d at 1028-29.
[84] *See id.* at 1029 (noting that a conspirator's knowledge of a conspiratorial act in Delaware after it occurs, but while the conspiracy is ongoing, is sufficient to satisfy *Istituto Bancario*'s fourth factor).

Finally, the fifth *Istituto Bancario* factor is satisfied because the formation of USRT Holdings was a direct and foreseeable result of the conduct in furtherance of the conspiracy. The formation of USRT Holdings and transfer of USRT's membership interests were important steps in the alleged conspiracy to rob USRT of its rights. Conduct constituting essential steps in achieving the conspiratorial goal is clearly foreseeable since it was intended.

C. *Due Process Analysis*

Analytically, the *Istituto Bancario* test applies only to the Court's due process analysis.[85] The conspiracy theory is not an independent theory of jurisdiction and does not provide an alternative route, independent of the long-arm statute, to secure personal jurisdiction over a defendant. Rather, the conspiracy theory "works in concert with [the long-arm statute] to provide a statutory basis for personal jurisdiction."[86] However, the *Istituto Bancario* factors ultimately test whether jurisdiction withstands due process scrutiny.[87]

Because Reid provides facts to support all *Istituto Bancario* factors, Finmeccanica is considered to have voluntarily participated in a conspiracy with the knowledge that acts were taken in Delaware. Finmeccanica is deemed to "have purposefully availed [itself] of conducting activities in [Delaware], thereby fairly

---

[85] Wolfe & Pittenger, § 3.04[b], at 3-87 to 88.
[86] *Chandler v. Ciccoricco*, 2003 WL 21040185, at *1 (Del. Ch. May 5, 2003).
[87] *Istituto Bancario*, 449 A.2d at 225.

31

invoking the benefits and burdens of [Delaware's] laws."[88] "[S]uch participation is a substantial contact with [Delaware] of a nature and quality that it is reasonable and fair to require [a defendant such as Finmeccanica] to come and defend an action [here]."[89] By satisfying *Istituto Bancario*'s five-part test, Reid has demonstrated that subjecting the Entity Defendants to jurisdiction comports with due process.

## III. STANDING

The Entity Defendants argue that even if they are subject to personal jurisdiction, Reid lacks standing to bring his derivative claims. In order to bring derivative claims on behalf of a limited liability company, "the plaintiff must be a member or an assignee of a limited liability company interest at the time of bringing the action and: (1) At the time of the transaction of which the plaintiff complains . . . ."[90]

Reid's derivative claims are based on the alleged conspiracy that did not end with the formation of USRT Holdings but continued until at least December 1999. Reid became a member of USRT Holdings on June 2, 1999, by exercising his right to demand a five percent membership interest from Capra. At this point, the alleged conspiracy was ongoing. Reid and Reed were not fired from their

---

[88] *Id.*
[89] *Id.*
[90] *CML V, LLC v. Bax*, 28 A.3d 1037, 1041 (Del. 2011).

positions at USRT Holdings, allegedly for attempting to protect USRT's rights, until August 1999. Also after Reid became a member, Siniscalchi and Capra allegedly failed to protect USRT's rights and Siniscalchi supposedly attempted to silence Reid by ordering him to "cease and desist from . . . taking actions and being in any way whatsoever associated with [USRT]."[91]

The "transaction of which the plaintiff complains" is the conspiracy to deprive USRT of its rights. Since Reid was a member of USRT Holdings when this "transaction" was ongoing and he remained a member as of the time he brought his action, he has standing to sue on USRT Holdings's behalf.

"A 'double derivative' action is a derivative action maintained by the shareholders of a parent corporation or holding company on behalf of a subsidiary company."[92] USRT Holdings has standing to sue on USRT's behalf because it became the sole owner of USRT in October 1998 and Finmeccanica supposedly misappropriated USRT's business opportunity after that date. Reid may bring a derivative action on USRT's behalf because USRT Holdings "has derivative rights to the cause of action possessed by the subsidiary."[93] Allegedly, this is a situation where a "subsidiary and its controller parent wrongfully refuse to enforce the

---

[91] SX27.

[92] *Sternberg v. O'Neil*, 550 A.2d 1105, 1107 n.1 (Del. 1988).

[93] *Sagarra Inversiones, S.L. v. Cementos Portland Valderrivas, S.A.*, 34 A.3d 1074, 1079 n.7 (Del. 2011).

subsidiary's claim directly."[94]   Reid has standing to sue derivatively on behalf of both USRT Holdings and USRT.

## IV.  CONCLUSION

Reid alleges that Finmeccanica engineered a conspiracy to misappropriate a valuable opportunity for itself.  He has alleged facts from which the Court can infer the existence of such a conspiracy.  While Reid's evidence is not especially strong, the inferences that he makes are consistent with the record.  At this stage in the proceedings, the Court is required to draw all reasonable inferences in Reid's favor, even if other inferences appear more probable.

Because Reid has established a basis for personal jurisdiction over the Entity Defendants and has standing to bring his derivative claims, Entity Defendants' Motion to Dismiss is denied.

An implementing order will be entered.

---

[94] *Id.*