# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

CÚRAM, LLC,                                    )
                                               )
              Plaintiff,              )
                                               )
              v.                      )   C.A. No. N23C-12-206 MAA CCLD
                                               )
BRANDON GRAY and STEPHANIE                     )
CHASE as executor of the ESTATE                )
OF MICHAEL J. O'CONNELL,                        )
                                               )
              Defendants.             )

Submitted: December 9, 2024
Decided: March 6, 2025

*Defendant Stephanie Chase's as Executor to the Estate of Michael J. O'Connell
Motion to Dismiss Amended Complaint:*
**GRANTED.**

## MEMORANDUM OPINION

Joseph Christensen, Esquire (Argued) of CHRISTENSEN LAW LLC, Wilmington, Delaware, *Attorney for Plaintiff*.

Paul D. Brown, Esquire of CHIPMAN BROWN CICERO & COLE, LLP, Wilmington, Delaware, and Melissa Chernofsky, Esquire (Argued) of CHIPMAN BROWN CICERO & COLE, LLP, New York, New York, *Attorneys for Defendant Stephanie Chase as executor of the Estate of Michael J. O'Connell*.

**Adams, J.**

# I. INTRODUCTION

This action arises out of Defendant Brandon Gray's ("Gray"), sale of three related medical companies (the "Sale") – PMC Medical Group, LLC, PMC Surgical Center, LLC, and PMC Daycare Center, LLC (collectively the "Companies") – to Plaintiff Curam, LLC ("Curam"). The Companies were founded and originally operated by Michael J. O'Connell ("O'Connell").[1] Several years before the Sale, however, O'Connell transferred ownership of the Companies to Gray (the "Transfer"). Despite the Transfer, Curam alleges O'Connell remained in effective control of the Companies until the Sale.

The parties effectuated the Sale with a Membership Interest Purchase Agreement (the "Agreement"). Curam alleges several of the Agreement's representations and warranties related to the Companies' financial positions were false. Curam also contends Defendants failed to disclose certain of the Companies' liabilities before the Sale. The Amended Complaint alleges these misrepresentations induced Curam to agree to the Sale. As a result, Curam filed this action, asserting claims for fraud, civil conspiracy, and breach of contract against Defendants.[2]

---

[1] O'Connell is deceased and represented in this litigation by Defendant Stephanie Chase as executor of the Estate of Michael J. O'Connell. Because O'Connell and his estate are identical in terms of their legal interests, the Court refers to them both interchangeably as O'Connell.

[2] The Court notes that Curam's breach of contract claim is only asserted against Gray. Amended Complaint (hereinafter "Compl.") ¶¶ 60-64.

Before the Court is O'Connell's Motion to Dismiss Curam's Amended Complaint (the "Motion"). The Motion argues the Court lacks personal jurisdiction over O'Connell. Alternatively, O'Connell argues the Amended Complaint fails to state a claim. The Court concludes O'Connell is not subject to jurisdiction in Delaware. O'Connell's Motion, therefore, is **GRANTED**.

## II. BACKGROUND[3]

### A. The Parties and the Companies Before the Sale

Plaintiff Curam is a Delaware limited liability company.[4] Defendant Gray is an individual resident of New Hampshire.[5] Defendant Stephanie Chase ("Chase") is the executor of O'Connell's estate and a resident of Massachusetts.[6] At the time of his death, O'Connell was a resident of New Hampshire.[7]

In 1992 O'Connell founded Pain Care Centers, Inc., ("PCC"), the Companies' predecessor.[8] PCC grew to include 12 offices, "making it the largest chain of pain care clinics in" New Hampshire.[9] At the same time, PCC faced "constant legal

---

[3] The facts described here are drawn from the Amended Complaint and the documents incorporated therein. The Court accepts those facts solely for the purpose of ruling on the Motion.

[4] Compl. ¶ 11.

[5] *Id.* ¶ 12.

[6] *Id.* ¶ 13; Affidavit of Stephanie Chase in Support of Defendant Stephanie Chase's as Executor to the Estate of Michael J. O'Connell Motion to Dismiss Amended Complaint (hereinafter "Chase Aff.") ¶¶ 1-2 (D.I. 18). The Court only considers the facts in the Chase Aff. for the purpose of ruling on O'Connell's Rule 12(b)(2) Motion to Dismiss. *See Harris v. Harris*, 289 A.3d 277, 296 (Del. Ch. 2023) ("When considering a Rule 12(b)(2) motion, the court is not limited to the allegations of the complaint and can consider evidentiary submissions provided by the parties.").

[7] Chase Aff. ¶ 3.

[8] Compl. ¶¶ 1, 16.

[9] *Id.* ¶ 16.

3

scrutiny under O'Connell" including: (1) a 2012 lawsuit related to sexual misconduct with patients, that resulted in O'Connell surrendering his medical license;[10] (2) a 2014 witness tampering charge related to the sexual misconduct allegations;[11] (3) a 2014 civil suit alleging PCC gave patients meningitis tainted injections;[12] and (4) various investigations for over prescribing opioids.[13]

In 2016, faced with those legal challenges, O'Connell and Gray agreed to the Transfer.[14] As part of the Transfer, PCC was rebranded into the Companies.[15] The Transfer, however, purportedly was a "sham sale," after which "O'Connell maintained direct control of the Companies in all aspects. All personnel understood O'Connell remained in charge, and that employees answer to O'Connell," who made all business decisions.[16] After the Transfer, Gray and O'Connell "refused direct communication with one another," as evidenced by a series of hostile emails.[17] These emails also indicate that O'Connell remained in effective control of the Companies post-Transfer.[18]

---

[10] *Id.* ¶ 17.
[11] *Id.*
[12] *Id.* ¶ 18.
[13] *Id.* ¶¶ 19-21.
[14] *Id.* ¶ 22.
[15] *Id.* ¶¶ 22, 24.
[16] *Id.* ¶¶ 24-25.
[17] *Id.* ¶¶ 26-31.
[18] *Id.* ¶¶ 26, 28-30.

## B. The Sale of the Companies to Curam

In November 2019, Curam began negotiating to buy the Companies.[19] As the Companies effective controller, O'Connell "negotiated all aspects of the transaction . . . responded to all due diligence questions and made other statements about the Companies, their operations, and the state of the business."[20] Curam alleges several email exchanges during negotiations evidence O'Connell's control, including: (1) a May 2020 email to an appraisal company where O'Connell stated, "Brandon [Gray] will do what I ask of him;"[21] (2) a September 2021 email from O'Connell directing Gray to sign a letter of intent;[22] and (3) several 2022 emails telling Gray how to communicate with third parties while also stating the "sham sale['s]" purpose was "deflecting any lawsuits over the [opioid] debacle."[23] These emails additionally suggest the Sale would benefit O'Connell, who expected to receive $500,000 in rental income from properties he owned that the Companies leased (the "O'Connell Properties").[24]

On July 17, 2022, Curam and Gray executed the Agreement, finalizing the Sale.[25] O'Connell was neither a signatory to, nor a named party in, the Agreement.[26]

---

[19] *Id.* ¶ 32.
[20] *Id.* ¶¶ 32-33.
[21] *Id.* ¶ 34.
[22] *Id.* ¶ 35.
[23] *Id.* ¶¶ 36-37.
[24] *Id.* ¶¶ 38-41.
[25] *Id.* ¶¶ 1, 32; *see* Compl., Ex. A (hereafter "Agreement").
[26] *See generally* Agreement.

As part of the Transaction, however, O'Connell signed an Option to Purchase Real Estate Letter (the "Option Letter"), which gave Curam the option to purchase the O'Connell Properties.[27] O'Connell also amended the O'Connell Properties' leases to lower the rent Curam would pay moving forward (the "Lease Amendments").[28]

## C. The Agreement

Delaware law governs the Agreement.[29] The Agreement also provides that "each of the parties hereto hereby submits to the exclusive jurisdiction of" any "federal or state court located in the State of Delaware, sitting in New Castle County."[30] The Agreement's preamble defines the parties thereto – Gray is the "Seller" and Curam is the "Buyer."[31]

Article III of the Agreement lists the "Representations and Warranties of Seller."[32] Section 4.9(a) disclaims that Curam "has not been induced by and has not relied upon any representations, warranties, or statements . . . that are not set forth in this Agreement and/or the Ancillary Agreements."[33] Section 9.5 is an integration

---

[27] Plaintiff Curam, LLC's Answering Brief in Opposition to Defendant's Motion to Dismiss (hereinafter "MTD Opp'n") at 3-4 (D.I. 28) (citing MTD Opp'n, Ex. A at Tab 9). The Court considers this fact, which does not appear in the Amended Complaint, solely for the purpose of ruling on the Rule 12(b)(2) Motion. *See Harris*, 289 A.3d at 296.

[28] *Id.* (citing MTD Opp'n, Ex. A at Tab 10). The Court considers this fact, which does not appear in the Amended Complaint, solely for the purpose of ruling on the Rule 12(b)(2) Motion. *See Harris*, 289 A.3d at 296.

[29] Agreement § 9.4.

[30] *Id.* § 9.12.

[31] *Id.* at Preamble.

[32] *Id.* Article III.

[33] *Id.* § 4.9(a).

clause, evidencing the Agreement set forth the parties' entire bargain.[34]   Curam

alleges six contractual Representations and Warranties were false at closing.[35]

Article VIII of the Agreement articulates the parties' indemnification

obligations.[36]   Section 8.2 details the procedure for providing notice of an

indemnification claim.[37]   Section 8.2(b) contemplates an indemnification claim for

"a Third-Party Action,"[38] – defined as "any Legal Proceeding by a Person other than

a party hereto for which indemnification may be sought by a party hereto."[39]   The

second relevant indemnification provision is Section 8.4(a), which "Cap[s]" "Sellers

total aggregate [indemnification] liability" at $150,000.[40]   Finally, Section 8.5

exempts "fraud" claims from the indemnification cap.[41]

Critically, Section 9.9 states there are no "third party beneficiar[ies]" to the

Agreement, except for a narrow carve-out not implicated here.[42]

---

[34] *Id.* § 9.5.
[35] Compl. ¶¶ 44-88.  Specifically, Curam alleges Sections 3.6 – Financial Statements; 3.9 – Real Property; 3.14 – Litigation; 3.16(b) – Employee Benefits; 3.18 – Insurance; and 3.27(d) – Healthcare Laws, were false. *Id.*  The specific text of these provisions is not relevant to resolving the Motion and is therefore omitted.
[36] Agreement Article VIII.
[37] *Id.* § 8.2.
[38] *Id.* § 8.2(b).
[39] *Id.* § 1.1.
[40] *Id.* § 8.4(a).
[41] *Id.* § 8.5.
[42] *Id.* § 9.9. Section 9.9 provides "that from and after the Closing, the D&O Indemnified Parties shall be third party beneficiaries of the provisions of Section 5.3, with the right to pursue claims for damages and other relief (including specific performance or other equitable relief) in the event of any breach thereof and may enforce such section directly." *Id.*

## D. Procedural History

Curam initiated this action in December 2023.[43]  After Chase moved to dismiss,[44] Curam filed an Amended Complaint in June 2024.[45]  The Amended Complaint asserts claims for: (1) Fraud against both Defendants;[46] (2) Civil Conspiracy against both Defendants;[47] and (3) Breach of Contract against Gray.[48]  In July 2024, Chase filed the Motion.[49]

On July 26, 2024, Curam filed a Rule 55(b)(2) Motion for Entry of Default Judgment against Gray based on "Gray['s] fail[ure] to respond to the [Amended] Complaint."[50]  The Court granted Curam's Motion for Default Judgment on August 28, 2024.[51]  Accordingly, Gray is not a party to the Motion and the Court does not discuss allegations specific to him.[52]

---

[43] *See* Complaint (D.I. 1).
[44] *See* Defendant Stephanie Chase's Motion to Dismiss Plaintiff's Complaint Pursuant to Rule 9(b), 12(b)(2), and 12(b)(6) (D.I. 10).
[45] *See* Compl.
[46] *Id.* ¶¶ 95-103.
[47] *Id.* ¶¶ 104-108.
[48] *Id.* ¶¶ 109-113.
[49] *See* Opening Brief in Support of Defendant Stephanie Chase's as Executor to the Estate of Michael J. O'Connell Motion to Dismiss Amended Complaint (hereinafter "MTD") (D.I. 18).
[50] *See* Plaintiff's Motion for Entry of a Default Judgment, ¶ 13. (D.I. 19).
[51] *See* Order Signed by Commissioner Parker on August 28, 2024, Granting Plaintiff's Motion for Default against Brandon Gray (D.I. 23).
[52] Because the breach of contract claim is only asserted against Gray, against whom default judgment was entered, that claim, and allegations only relating thereto, are not discussed further.

Curam filed its brief opposing the Motion in October 2024.[53]  Chase filed a reply brief in November 2024,[54] and the Court held oral argument on the Motion on December 9, 2024.[55]

## III.  STANDARD OF REVIEW

### A. Rule 12(b)(2) Motion to Dismiss

Superior Court Civil Rule 12(b)(2) permits a non-resident defendant to "move to dismiss for lack of personal jurisdiction[.]"[56]  A plaintiff "does not have the burden to plead in its complaint facts establishing [the] court's personal jurisdiction over [a] defendant."[57]  Upon a Rule 12(b)(2) motion, however, the "plaintiff bears the burden of showing a basis for a trial court's exercise of jurisdiction over a nonresident defendant."[58]  Accordingly, "[i]n ruling on a Rule 12(b)(2) motion, the Court may consider the pleadings, affidavits, and discovery of record."[59]  The court applies "a two-pronged analysis, first considering whether Delaware's Long Arm Statute is applicable, and then determining whether subjecting the nonresident defendant to

---

[53] *See* MTD Opp'n.

[54] *See* Reply Brief in Support of Defendant Stephanie Chase's as Executor to the Estate of Michael J. O'Connell Motion to Dismiss Amended Complaint (hereinafter "MTD Reply") (D.I. 29).

[55] *See* Judicial Action Form for 12/9/2024 (D.I. 33).

[56] *Green America Recycling, LLC v. Clean Earth, Inc.*, 2021 WL 2211696, at *3 (Del. Super. June 1, 2021).

[57] *Focus Financial Partners, LLC v. Holsopple*, 241 A.3d 784, 800 (Del. Ch. 2020) (internal quotes omitted).

[58] *AeroGlobal Capital Management, LLC v. Cirrus Industries, Inc.*, 871 A.2d 428, 437 (Del. 2005).

[59] *Economical Steel Building Technologies, LLC v. E. West Construction, Inc.*, 2020 WL 1866869, at *1 (Del. Super.  Apr. 14, 2020) (quoting *Ryan v. Gifford*, 935 A.2d 258, 265 (Del. Ch. 2007)).

jurisdiction in Delaware violates the Due Process clause of the Fourteenth Amendment."[60]  In conducting that analysis, "the record is construed in the light most favorable to the plaintiff."[61]

## IV.  DISCUSSION

The Motion advances two primary arguments.[62]  First, Chase argues the Court lacks personal jurisdiction over O'Connell's estate.[63]  Second, the Motion contends the Amended Complaint fails to state a claim for civil conspiracy or fraud.[64]  Because the Court concludes it lacks personal jurisdiction over O'Connell, it need not address whether the Amended Complaint states a claim for relief.

The jurisdictional affidavit attached to the Motion shows O'Connell was a resident of New Hampshire from 1987 until his death in 2023.[65]  During that time, the only other place O'Connell resided was Columbia.[66]  O'Connell was never a Delaware resident and never conducted any business in Delaware.[67]  Accordingly, O'Connell did not have sufficient contacts with Delaware to subject him to general

---

[60] *Mason v. Allstate Indemnity Company*, 2024 WL 4563935, at *2 (Del. Super. Oct. 23, 2024) (citing *Biomeme, Inc. v. McAnallen*, 2021 WL 5411094, at *2 (Del. Super. Nov. 10, 2021)).
[61] *Cornerstone Techs., LLC v. Conrad*, 2003 WL 1787959, at *3 (Del. Ch. Mar. 31, 2003) (internal quotes omitted).
[62] *See generally* MTD.
[63] *Id.* at 2, 6-13.
[64] *Id.* at 13-18.
[65] Chase Aff. ¶ 3.
[66] *Id.* ¶ 4.
[67] *Id.* ¶ 5.

personal jurisdiction.[68]  Thus, if the Court has jurisdiction over O'Connell's estate, it must be specific personal jurisdiction arising out of the actions challenged here.[69]

The Amended Complaint alleges the Agreement provides personal jurisdiction over O'Connell.[70]  Specifically, the Amended Complaint states, "[i]n the Agreement, the parties further submitted to the exclusive jurisdiction of the federal or state courts located in the State of Delaware."[71]  Yet, it is undisputed that O'Connell did not sign the Agreement.[72]  Curam asserts two bases for how O'Connell is nevertheless bound by the Agreement's forum selection clause: (1) O'Connell is a third-party beneficiary, or closely related, to the Agreement and Curam's claims arises from his standing thereunder;[73] and (2) the Court has "conspiracy theory jurisdiction."[74]  The Court addresses each contention in turn.

### A. O'Connell is Not a Third-Party Beneficiary or Closely Related to the Agreement.

Curam first argues the Agreement's forum selection clause conveys jurisdiction over O'Connell because he is a third-party beneficiary to the contract.[75]

---

[68] *Id.* ¶¶ 5-9; *see* 10 *Del. C.* § 3104(c) (outlining the basis pursuant to which the Court may exercise general jurisdiction over a non-resident defendant, none of which are relevant here).

[69] *See Ross v. Earth Movers, LLC*, 288 A.3d 284, 294 (Del. 2023) ("Specific jurisdiction is triggered when the plaintiff's claims arise out of acts or omissions, by the defendant, that take place in Delaware."). *See also Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 472-82 (1985).

[70] Compl. ¶ 15.

[71] *Id.*

[72] *See generally* Agreement.

[73] MTD Opp'n at 6-15.

[74] *Id.* at 16-22.

[75] MTD Opp'n at 7-10.

11

"Delaware Courts use a three-part test to determine whether a non-signatory may be bound by a forum selection clause" as a third-party beneficiary.[76] Specifically, courts consider:

> First, is the forum selection clause valid? Second, is [the non-signatory] a third-party beneficiary or closely related to the contract? Third, does the claim arise from his standing relating to the agreement? If the answer to all three questions is "yes," then the forum selection clause may bind [the non-signatory].[77]

Chase argues the Amended Complaint meets neither the second nor the third element of this test with respect to O'Connell.[78] Because the Court concludes O'Connell is not a third-party beneficiary or closely related to the Agreement, the Court need not address the third element.

O'Connell is not a third-party beneficiary to the Agreement. A non-signatory is a third-party beneficiary when: (1) the contracting parties intended to benefit the third-party; (2) the benefit was intended as a gift or satisfaction of a pre-existing obligation; and (3) the intent to benefit was material to the purpose of entering the agreement.[79] The contracting parties' intent governs whether a non-signatory is a third-party beneficiary.[80]

---

[76] *In re Bracket Holding Corp. Litigation*, 2017 WL 3283169, at *15 (Del. Super. July 31, 2017).
[77] *Id.*
[78] MTD at 8-13.
[79] *McClements v. Savage*, 2007 WL 4248481, at *1 (Del. Super. Nov. 29, 2007) (citations omitted).
[80] *Id.*

Here, the parties evidenced their intent in Section 9.9 – which explicitly states "[n]othing in this Agreement, whether express or implied, shall be construed to give any Person . . . any legal or equitable right . . . as a third party beneficiary[.]"[81] While boilerplate third-party beneficiary disclaimers are not necessarily binding,[82] courts enforce "customized" provisions.[83] A specific carve-out to a third-party beneficiary disclaimer evidences a customized provision.[84] Here, Section 9.9 has a carve-out,[85] showing the parties intended it to be a customized, enforceable, third-party beneficiary disclaimer. Curam maintains O'Connell is nevertheless a third-party beneficiary, because O'Connell controlled the Sale's negotiations and it is "conceivable [he] . . . intended to benefit himself."[86] That argument, however, does not overcome the Agreement's plain text, which states there are no third-party beneficiaries.[87] Accordingly, the Court concludes Section 9.9 is enforceable, and precludes finding that O'Connell is a third-party beneficiary to the Agreement.

---

[81] Agreement § 9.9.

[82] *Crispo v. Musk*, 2022 WL 6693660, at *5 (Del. Ch. Oct. 11, 2022).

[83] *Id.* *See Fortis Advisors LLC v. Med. Co., & Melinta Therapeutics, Inc.*, 2019 WL 7290945, at *4 (Del. Ch. Dec. 18, 2019).

[84] *Crispo*, 2022 WL 6693660, at *4-5.

[85] Agreement § 9.9 ("from and after the Closing, the D&O Indemnified Parties shall be third party beneficiaries of the provisions of Section 5.3, with the right to pursue claims for damages and other relief (including specific performance or other equitable relief) in the event of any breach thereof and may enforce such section directly.").

[86] MTD Opp'n at 7-9. Curam contends O'Connell's anticipated benefit, as evidenced by his emails, included Gray satisfying his debts to O'Connell and rental income from the leased properties. *Id.* at 9-10.

[87] *See Weinberg v. Waystar, Inc.*, 294 A.3d 1039, 1044 (Del. 2023) (holding courts "read the contract as a whole and 'enforce the plain meaning of clear and unambiguous language.'" (quoting *Manti Hldgs, LLC v. Authentix Acquisition Co., Inc.*, 261 A.3d 1199, 1208 (Del. 2021))).

Curam argues that even if O'Connell is not a third-party beneficiary, he is "closely related" to the Agreement.[88] A non-signatory is "closely related" to a contract when "the party receives a direct benefit from the agreement or [] it was foreseeable that the party would be bound by the agreement."[89] Curam points to the rental income from the O'Connell Properties as a direct benefit.[90] Regarding foreseeability, Curam asserts two arguments.[91] First, O'Connell was a "control person" because he ran the Companies and negotiated the Transaction.[92] Second, O'Connell's signing of the Option Letter and Lease Amendments, made it foreseeable that he would be bound by the Agreement.[93] None of these arguments demonstrate that O'Connell was closely related to the Agreement.

The Agreement did not provide O'Connell with a direct benefit. While "both pecuniary and non-pecuniary benefits . . . satisfy the test. . . . indirect benefits have been deemed insufficient[.]"[94] Curam relies on *Weygandt v. Weco, LLC*[95] to argue lease income for the O'Connell Properties constitutes a direct benefit.[96] In *Weygandt*, the Court of Chancery held a non-signatory lessor was bound by a

---

[88] MTD Opp'n at 10-14.
[89] *In re Bracket*, 2017 WL 3283169, at *15.
[90] MTD Opp'n at 11-12.
[91] *Id.* at 12-15.
[92] *Id.* at 12-13.
[93] *Id.* at 14 (citing MTD Opp'n, Ex. A Tab 9).
[94] *Neurvana Medical, LLC v. Balt USA, LLC*, 2019 WL 4464268, at *4 (Del. Ch. Sept. 18, 2019) (citing *Capital Gp. Cos. v. Armour*, 2004 WL 2521295, at *7 (Del. Ch. Oct. 29, 2004)).
[95] 2009 WL 1351808 (Del. Ch. May 14, 2009).
[96] MTD Opp'n at 11-12.

Delaware forum selection clause in an agreement that effectuated the sale of a company using the leased properties.[97] The court concluded, "[t]he Lease Agreement is a direct benefit to [the lessor] because it provides a lucrative tenant."[98] Critical to that conclusion, however, was the fact that prior to the transaction the lessor was not entitled to any rental income.[99] Thus, the agreement allowed the lessor "to shift a major portion of its costs of operating . . . to [buyer], which is a direct benefit to [lessor]."[100] That key fact is missing here, and demonstrates why the Agreement did not provide O'Connell with a direct benefit.

Prior to the Sale, O'Connell was entitled to rental income on the O'Connell Properties, which were leased by the Companies owned by Gray.[101] While the Complaint suggests Gray missed some payments,[102] it is undisputed that O'Connell had a right to collect rent from the Companies before the Sale.[103] Thus, unlike in *Weygandt*, the Sale did not provide O'Connell with any benefit he did not already have. Indeed, six of the seven Lease Amendments *lowered* the Companies' rental

---

[97] *Weygandt*, 2009 WL 1351808, at *1-2, 5.
[98] *Id.* at *5.
[99] *Id.* at *1-2, 5.
[100] *Id.* at *5
[101] Compl. ¶ 41 (quoting an email from O'Connell to Gray which read in part "I am owed about $436k for back rents[.]"); *see* MTD Opp'n, Ex. A Tab 10 (Lease Amendments showing the Companies were obligated to pay O'Connell rent before the Sale).
[102] Compl. ¶ 41.
[103] MTD Opp'n, Ex. A Tab 10.

obligation to O'Connell.[104]  Thus, the Sale decreased the benefit to which O'Connell was entitled.  Therefore, the Sale did not provide O'Connell with a direct benefit.

Similarly, O'Connell's execution of the Lease Amendments and Option Letter did not make it "foreseeable" that he would be bound by the Agreement's forum selection clause.  The foreseeability prong applies "when the circumstances surrounding the transaction make it clear that the parties expected the forum selection provision to bind the non-signatory."[105]  Courts "apply the foreseeability test cautiously."[106]  Thus, when considering "foreseeability [] as a standalone basis for satisfying the closely-related test . . . the foreseeability inquiry [] require[s] that the signatory control the non-signatory."[107]

Here, there is no allegation that O'Connell, the non-signatory, was controlled by the Companies, the signatory.  Rather, the Complaint alleges the opposite – that "O'Connell, at all times, was the true operator of the Companies with direct control over Gray and the Companies."[108]  The Court of Chancery declined to extend the

---

[104] *Id.*

[105] *Florida Chemical Company, LLC v. Flotek Industries, Inc.*, 262 A.3d 1066, 1092 (Del. Ch. Aug. 17, 2021).

[106] *Id.* (citing *Neurvana Medical, LLC v. Balt USA, LLC*, 2019 WL 4464268, at *6 (Del. Ch. Sept. 18, 2019)).

[107] *Neurvana Medical*, 2019 WL 4464268, at *5-6 (citing at *Imodules Software, Inc. v. Essenza Software, Inc.*, 2017 WL 6596880, at *2 (Del. Ch. Dec. 22, 2017)); *Ashall Homes Ltd. v. ROK Entertainment Group Inc.*, 992 A.2d 1239, 1248 (Del Ch. Apr. 23, 2010) (stating the purpose of the foreseeability test is to prevent "an end-run around an otherwise enforceable Forum Selection Provision[.]").

[108] *E.g.*, Compl. ¶ 32.

foreseeability doctrine to apply to a non-signatory controller of an entity that signs an agreement containing a forum selection clause.[109] The court also refused the invitation to "adopt a new application of the [foreseeability] inquiry . . . that [the controllers] active involvement in negotiating the [underlying agreement] standing alone should satisfy the foreseeability inquiry."[110] This Court similarly rejects Curam's identical argument.[111] Even if the Court were writing on a blank slate, it would not be inclined to adopt Curam's reasoning which disregards fundamental principles of Delaware corporate law regarding corporate formalities.[112] Thus, it was not foreseeable that O'Connell would be bound by the Agreement's forum selection clause.

Because the Agreement did not give O'Connell a direct benefit, and it was not foreseeable that he would be bound by the forum selection clause, the "closely related" test does not provide personal jurisdiction over his estate.

---

[109] *Neurvana Medical*, 2019 WL 4464268, at *6-7 ("Balt USA does not control Balt International, which was a necessary predicate to the Court's holding in *iModules*. In fact, Plaintiff alleges the opposite—that Balt International controlled Balt USA—for the purpose of its agency argument.").
[110] *Id.* at *7.
[111] *See* MTD Opp'n at 12-14 ("[i]t was foreseeable that O'Connell would be bound by the forum selection clause because O'Connell negotiated the forum selection clause into the Agreement[.]").
[112] *See Feeley v. NHAOCG, LLC*, 62 A.3d 649, 667 (Del. 2012) ("the separate legal existence of juridical entities is fundamental to Delaware law. Delaware law likewise respects the correlative principle of limited liability, which generally enables those who form entities to limit their risk to the amount of their investment in the entity.").

### B. The Amended Complaint Does Not Allege that the Court has Conspiracy Theory Jurisdiction over O'Connell.

Curam also argues the Court has "conspiracy theory jurisdiction over O'Connell."[113]  The court has personal jurisdiction pursuant to the conspiracy theory doctrine when "(1) a conspiracy to defraud existed; (2) the defendant was a member of that conspiracy; (3) a substantial act or substantial effect in furtherance of the conspiracy occurred in the forum state; (4) the defendant knew or had reason to know of the act in the forum state or that acts outside the forum state would have an effect in the forum state; and (5) the act in, or effect on, the forum state was a direct and foreseeable result of the conduct in furtherance of the conspiracy."[114]  Because "[t]he conspiracy theory of jurisdiction is narrowly and strictly construed,"[115] failure to satisfy any one of these elements warrants dismissal.[116]  While the parties dispute whether the Amended Complaint states a claim for conspiracy,[117] the Court need not

---

[113] MTD Opp'n at 16-22.

[114] *Instituto Bancario Italiano, SpA v. Hunter Engineering Co., Inc.*, 449 A.2d 210, 225 (Del. 1982).

[115] *Id. See Ciabattoni v. Teamsters Local 326*, 2017 WL 1175665, at *4 (Del. Super. Mar. 28, 2017) ("[t]he Supreme Court[] [of Delaware] insistence that the conspiracy theory of personal jurisdiction undergo strict factual proof[.]").

[116] *See Computer People, Inc. v. Best Intern. Group, Inc.*, 1999 WL 288119, at *6 (Del. Ch. Apr. 27, 1999).

[117] *Compare* MTD at 13-15 (arguing the Amended Complaint fails to state a claim for civil conspiracy), *and* MTD Reply at 11-12, 18 (same), *with* MTD Opp'n at 16-18, 23 (arguing the Amended Complaint states a claim for civil conspiracy). *See also Hamilton Partners, L.P. v. Englard*, 11 A.3d 1180, 1197 (Del. Ch. Dec. 15, 2010) ("the first and second *Istituto Bancario* elements are whether a conspiracy existed and whether the foreign defendant was a member of the conspiracy.").

address that issue because Curam failed to plead facts supporting elements three, four, and five.

The final three *Instituto Bancario* elements consider the connection between Delaware and the alleged conspiracy. Curam asserts the inclusion of a Delaware forum selection clause in the Agreement, which it alleges O'Connell negotiated, satisfies these elements.[118] Specifically, Curam argues the Delaware forum selection clause demonstrates that "O'Connell knew his misrepresentations would result in an action being brought in Delaware."[119] That argument is factually deficient.

The Amended Complaint alleges O'Connell and Gray conspired "to make material and intentional misrepresentations regarding the Companies in order to induce Curam to purchase the Companies."[120] It is undisputed that the Companies are located in New Hampshire,[121] and there are no allegations any of the Sale negotiations took place in Delaware. The only connection the Sale had to Delaware was the Agreement's forum selection clause.[122] Yet, Curam provides no facts regarding why "a critical step in the [alleged] conspiracy was" the inclusion of that forum selection clause, as is required to "satisfy *Instituto Bancario*[.]"[123] This purports with common sense. The Court can conceive of no reason why including

---

[118] MTD Opp'n at 18-22.
[119] *Id.* at 20-22.
[120] Compl. ¶ 105.
[121] *Id.* ¶ 16.
[122] *See* Agreement § 9.12.
[123] *Matthew v. Fläkt Woods Group SA*, 56 A.3d 1023, 1029-30 (Del. 2012).

a Delaware forum selection clause would further Defendants' ability to misrepresent the Companies' economic status and induce the Sale. Because the Delaware forum selection clause does not convey personal jurisdiction over O'Connell "under § 3104(c)[,] it is "also not [a] 'substantial act[] or effect[]' in furtherance of the conspiracy that would support personal jurisdiction under the conspiracy theory."[124] Accordingly, Curam has not shown that the alleged conspiracy is sufficiently connected to Delaware to support conspiracy theory jurisdiction over O'Connell's estate.

Because both of Curam's theories fail to establish this Court's personal jurisdiction over O'Connell, the Court **GRANTS** the Motion.

## V.    CONCLUSION

For the foregoing reasons, Chase's Motion to Dismiss is **GRANTED**.

**IT IS SO ORDERED.**

/s/ Meghan A. Adams

**Meghan A. Adams, Judge**

---

[124] *Computer People*, 1999 WL 288119, at *7.

20